**In re Dwayne SCRIMPSHER and Karen Scrimpsher, Debtors.**

**WEGMANS FOOD MARKETS, INC., Plaintiff,**

**v.**

**Karen SCRIMPSHER, Defendant,**

**Eustrah, Inc., d/b/a Continental Collection Bureau, Additional Defendant on Counterclaim.**

**Bankruptcy No. 80 01549.**
**Adv. No. 80 0201.**

United States Bankruptcy Court, N. D. New York.

March 5, 1982.

■■■■■■■■■■■■■■■■■■■

Mackenzie, Smith, Lewis, Michell & Hughes, Syracuse, N. Y., for plaintiff; Kenneth E. Ackerman, Syracuse, N. Y., of counsel.

Baker & Clark, Syracuse, N. Y., for defendant, Karen Scrimpsher; James M. Baker, Syracuse, N. Y., of counsel.

Mousaw, Vigdor, Reeves, Herbronner, & Kroll, Rochester, N. Y., for defendant, Eustrah, Inc.; Thomas E. Goldman, Rochester, N. Y., of counsel.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

LEON J. MARKETOS, Bankruptcy Judge.

### Statement of the Case

On October 16, 1980, Dwayne and Karen Scrimpsher filed a joint petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.* (Supp. IV 1980) (hereinafter, the Code). On December 23, 1980, Wegmans Food Markets, Inc. (hereinafter, Wegmans) filed a complaint objecting to the discharge of certain "NSF" (not sufficient funds) checks uttered by Karen Scrimpsher (hereinafter, the Debtor) to Wegmans. Those NSF checks were a listed debt in the Debtor's bankruptcy schedules. The Debtor interposed an "ANSWER AND COUNTERCLAIMS". The Debtor's counterclaims are premised on alleged violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (Supp. IV 1980) (hereinafter, FDCPA or the Act)[1] and § 349(a) of the New York General Business Law (hereinafter, N.Y. counterclaim).[2]

Although the parties proceeded to file cross-motions for summary judgment, the Debtor also moved pursuant to Rules 713, 715, 719(a), and 720 of Bankruptcy Procedure[3] and Rules 13(h), 15(a), 19(a)(1) and 20 of the Federal Rules of Civil Procedure to join Eustrah, Inc., d/b/a Continental Collection Bureau (hereinafter, C.C.B.) as an additional defendant on the Debtor's two counterclaims. On May 8, 1981, an order was entered granting the Debtor leave to serve an amended answer and counterclaims on both Wegmans and C.C.B. which was filed May 13, 1981. On June 16, 1981, the Debtor amended her Schedule B–3(b) and her Schedule B–4 "Property Claimed Exempt" pursuant to the federal exemptions list, *see* 11 U.S.C. § 522(d)(5), to include the Debtor's counterclaims[4] against C.C.B. and Wegmans at a valuation of "$2,100.00 (maximum)".

Both Wegmans and C.C.B. responded to the Debtor's new responsive pleadings by

---

1. Pub.L.No.95–109, 91 Stat. 874 (1977).

2. N.Y.Gen.Bus.Law, 349(a) (Supp. McKinney 1981).

3. The Rules of Bankruptcy Procedure applicable to the repealed Bankruptcy Act of 1898 insofar as they are consistent with the new Bankruptcy Reform Act of 1978 (Code) remain in effect until they are repealed or superceded by new rules. *See* Bankruptcy Reform Act of 1978, Pub.L.No.95–598, Title IV, § 405(d), § 410, 92 Stat. 2685, 2687 (1978).

4. *Cf. Matter of Smith*, 640 F.2d 888 (7th Cir. 1981), *rev'g*, 5 B.R. 500, 6 BCD 667 (C.D.Ill. 1980) (Seventh Circuit holding that debtor's cause of action for violations of the Truth-in-Lending Act could be claimed as exempt under Code § 522(d)(1) and (5), 11 U.S.C. § 522(d)(1)

Reply and Answer, respectively. Thereafter, C.C.B. duly served an amended answer which added to its denials an affirmative defense of lack of subject matter jurisdiction in the bankruptcy court to the Debtor's FDCPA counterclaim. All parties made cross-motions for whole or partial summary judgment pursuant to Rules 56 and 56(d) of the Federal Rules of Civil Procedure.[5]

## MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

■ In both C.C.B.'s amended answer to the Debtor's counterclaims and its motion papers for summary judgment the threshold question of this Court's subject matter jurisdiction is raised.[6] Although no party had moved to dismiss on the ground of lack of subject matter jurisdiction, the Court requested memoranda of law on the issue.[7] The sum of C.C.B.'s argument is that, for purposes of the Debtor's FDCPA claim, this federal bankruptcy court is not a court with jurisdiction that qualifies under § 813(d) of the FDCPA.[8] This contention is erroneous because a federal bankruptcy court operating under the Bankruptcy Reform Act of 1978 obtains jurisdiction from § 1471 of Title 28 of the United States

Code. Bankruptcy Reform Act of 1978, Title II, § 241(a), Pub.L.No.95–598, 92 Stat. 2668–69 (1978). Yet, it is a well-established principle that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress. *Aldinger v. Howard*, 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976); *see County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979). *See generally*. C. Wright, *Law of Federal Courts*, § 7 (3d ed. 1976).

■ The delegated and direct grants of jurisdiction to bankruptcy courts operating under the Bankruptcy Code are set out under 28 U.S.C. § 1471(b), (c), and (e). They state:

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts *shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.*

(c) The *bankruptcy court* for the district in which a case under title 11 is com-

---

and (5)); *see also Matter of Eldridge*, 15 B.R. 594 (Bkrtcy.S.D.N.Y.1981); *In re Upright*, 1 B.R. 694, 5 BCD 1124 (Bkrtcy.N.D.N.Y.1979).

5. Summary judgment under Rule 56, Fed.R.Civ. Proc., is made applicable to adversary proceedings in the U.S. Bankruptcy Courts through Rule 756 of the Rules of Bankruptcy Procedure. *Severance v. United States*, 437 F.Supp. 5, 6 (N.D.Tex.1977), *aff'd*, 593 F.2d 4 (5th Cir. 1979) (per curiam).

6. Because the defense of lack of subject matter jurisdiction is a matter *in abatement* rather than *the merits* of a cause of action, it must be noted that summary judgment is not the proper procedure by which to raise that defense. *See Marshall v. Baker*, 500 F.Supp. 145, 152 (N.D. N.Y.1980); *Kantor v. Comet Press Books Corporation*, 187 F.Supp. 321, 322 (S.D.N.Y.1960); *See generally* 6 J. Moore, Moore's Federal Practice ¶ 56.03 at 56–55 to 56–57 (2d ed. 1980); C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2713 at 402–06. This Court shall deem C.C.B.'s summary judgment argument on jurisdiction as a motion to dismiss pursuant to Rule 12(b)(1), Fed.R.Civ.Proc., Rule 712 of Rules of Bankr.Proc.

7. The lack of subject matter jurisdiction is so fundamental a defect that Rule 12(h)(3) of the Federal Rules of Civil Procedure permits a judge to recognize it *sua sponte* at any time. *See Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 979 (2d Cir. 1975); *accord Wes-Flo Inc. v. Wilson Freight Company*, 13 B.R. 617, 619 (Bkrtcy.S.D.Ohio 1981).

8. Section 813(d), 15 U.S.C. § 1692k(d) (Supp. IV 1980) reads:

An action to enforce any liability created by this title may be brought in any appropriate United States district court without regard to the amount in controversy, or in any court of competent jurisdiction, within one year from the date on which the violation occurs.

The language is to be construed as a concurrent grant of jurisdiction to U.S. district and state courts. *See* S.Rep.No.382, 95th Cong., 1st Sess. 8 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 1695, 1702; *Peterson v. United Accounts, Inc.*, 638 F.2d 1134, 1135–36 (8th Cir. 1981) (dictum).

menced *shall exercise all* of the jurisdiction conferred by this section on the district courts.

\* \* \* \* \* \*

(e) The *bankruptcy court* in which a case under title 11 is commenced *shall have exclusive jurisdiction of all* of the *property,* wherever located, *of the debtor, as of the commencement of such case.*

*Id.* (Emphasis added). The Debtor's counterclaims, both federal and state, cannot be said to be claims which are "arising under title 11" in that there are no allegations of need to construe or implement any provision of title 11 to determine the merits of the Debtor's counterclaims. *See* H.R.Rep. No.595, 95th Cong., 1st Sess. 445 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6401. The counterclaims are now exempt property under § 522(d)(1) and (5), and their *status* as exempt property is not in dispute. The next inquiry is whether the Debtor's counterclaims can be said to be "civil proceedings ... arising in or related to ˙ cases under title 11." 28 U.S.C. § 1471(b).

The exact meaning of "arising in or related to cases under title 11" is not given by the legislative history. For illustrative purposes, the House Report states:

> Examples of matters that the bankruptcy court will be able to hear include all items listed by the Bankruptcy Commission in its proposed bill, H.R. 31, 94th Cong., 1st Sess. §§ 2–201(a), 2–201(b) (1975), or the equivalents to those items under title 11 as proposed by H.R. 8200, as well as all items that the bankruptcy courts are now able to hear under the Bankruptcy Act 2a(2A).

H.R.Rep.No.595, 95th Cong., 1st Sess. 446 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6401. The pertinent provisions in the "Commission Bill" concerning the bankruptcy court's jurisdiction and a relationship to exemptions read:

> Section 2–201. Jurisdiction of the Bankruptcy Courts.
>
> (a) *Controversies Arising out of a Case.* The jurisdiction of the bankruptcy courts shall extend to the determination of all controversies that arise out of a case commenced under this Act, including, without limitation, the following:
>
> \* \* \* \* \* \*
>
> (2) controversies *involving property set apart* to the debtor *as exempt, including* the enforcement of claims, whether or not secured, against such property;

Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. 137, 93rd Cong., 1st Sess. Part II, 30 (July, 1973) (Emphasis added). Earlier in the Commission's Report (Part I) among the particular recommendations concerning consumer bankrupts was that "(5) The bankruptcy court be given jurisdiction of disputes between the debtor and his creditors involving the property set apart to him. as exempt." *Id.*, Part I, at 11. These comments appear to speak to instances when the debtor's exemption is to be impaired by some type of creditor conduct.

Although the Debtor's counterclaim is interposed in an adversary proceeding in his Chapter 7 bankruptcy case, the interpretative issue is whether that fact alone meets the "arising in" language of 28 U.S.C. § 1471(b)'s jurisdictional grant. Remembering the "limited jurisdiction" of all federal courts, I believe one must find a reasonable nexus between the Debtor's.civil proceeding for affirmative relief and this Court's particularized function of implementing the bankruptcy laws. The inquiry must find an impact serving the purposes of the bankruptcy laws sufficient to warrant this Court to decide the merits of the Debtor's counterclaims.

This is an instance when the pre-petition causes of action are not being litigated for any subsequent benefit to the property of the estate which will be distributed to unsecured creditors. Also, the Debtor's counterclaims do not speak to resolving a dispute or interference with the designated exempt property. Yet, despite the absence of clear guidance from legislative history, there is a basis to find jurisdiction over the Debtor's counterclaims and support the reasoning

that such a controversy *arises in the Debtor's case* under Title 11. The ability to fully utilize an exemption as claimed is concomitant with providing those exemptions for a debtor's post-petition "fresh start". The Congressional intent to provide to the trustee in bankruptcy a single forum that can expeditiously assist in litigating his several rights and remedies under the Bankruptcy Code is equally applicable to the "fresh start" needs of a debtor. If the bankruptcy laws have accorded an exemption of such contingent nature to the debtor, when appropriate, the laws logically should assist in the necessary litigation intrinsic to the exemption's use during the bankruptcy case. Burdening the debtor with more delay and expense in other forums runs antithetical to a *prompt* rehabilitation of the debtor. I find the Debtor's counterclaims necessarily arise in his case under Title 11.[9]

■ Is there an alternative ground for bankruptcy court jurisdiction over the Debtor's exempt counterclaims? Looking towards the exclusive grant of jurisdiction under 28 U.S.C. § 1471(e), it appears that causes of action which accrue prior to the filing of the bankruptcy petition qualify as "property of the debtor". The legislative history indicates that the Bankruptcy Reform Act codifies a rejection of the holding in *Lockwood v. Exchange Bank*, 190 U.S. 294, 299, 23 S.Ct. 751, 753, 47 L.Ed. 1061 (1903) that once exemptions had been declared, the bankruptcy court no longer had jurisdiction over such property to protect it against the claims of creditors. *Matter of Pickus*, 8 B.R. 114, 120, 7 BCD 189, 193 (Bkrtcy.D.Conn.1980); *see* H.R.Rep.No.595, 95th Cong., 1st Sess. 368 (1977); S.Rep.No.

989, .95th Cong., 2d Sess. 82 (1978). It is not contrary to the spirit and intent of Congress to construe an extension of jurisdiction to provide *affirmative* relief for property rights of a debtor. Rather, jurisdiction appears necessarily to exist for the duration of the Title 11 case. *Cf., In re Johnson*, 13 B.R. 185 (Bkrtcy.M.D.Tenn.1981) (court entertained debtor's Truth-in-Lending Act action which was abandoned by trustee). I find the Court has jurisdiction to entertain the Debtor's FDCPA and N.Y. counterclaims. The C.C.B. motion to dismiss is denied.

## MOTIONS FOR SUMMARY JUDGMENT

The cross-motions of the parties are as follows: (1) The Debtor seeks partial summary judgment on liability as to its first and second counterclaims against both Wegmans and C.C.B.; (2) Wegmans seeks partial summary judgment dismissing the Debtor's first and second counterclaims; and (3) C.C.B. seeks summary judgment dismissing the Debtor's first and second counterclaims and an award of attorneys' fees pursuant to § 813(a)(3) of the Act, 15 U.S.C. § 1692k(a)(3).

■ In opposition to the Debtor's motion for partial summary judgment on the liability issues, the memorandum and supporting affidavits of C.C.B. contain strenuous protest to the contents of the affidavit of Mr. Baker, the Debtor's attorney. The focus of C.C.B.'s objection is Baker's sworn statements concerning the actual conduct of business relations between Wegmans and C.C.B. which on their face are devoid of a personal knowledge basis.[10] An attorney's

---

**9.** The true dimensions of bankruptcy jurisdiction under 28 U.S.C. § 1471(b) as intended by Congress is far from clear to the legal academic community. *See generally* Note, *Bankruptcy and the Limits of Federal Jurisdiction*, 95 Harv. L.Rev. 703 (1982) (arguing that the primary federal interest in bankruptcy litigation, and the *only* justification for federal jurisdiction, being the conservation and equitable distribution of the debtor's estate *id.* at 711); Note, *Selective Exercise of Jurisdiction in Bankruptcy Related Civil Proceedings*, 59 Tex.L.Rev. 325 (1981) (arguing for case-by-case abstention from "related to" bankruptcy jurisdiction to

avoid docket congestion in light of the broad jurisdictional grant *id.* at 331–33).

**10.** It is clear that Rule 56(e), Fed.R.Civ.Proc. requires that the moving party meet its burden by submitting affidavits (1) made on personal knowledge; (2) which set forth admissible evidentiary facts; and (3) affirmatively show that the affiant is competent to testify to the matters contained therein. *Schiess-Froriep Corporation v. S.S. Finnsailor*, 574 F.2d 123, 125 (2d Cir. 1978); The policy of Rule 56(e) is to allow the affidavit to contain all evidentiary matter, which, if the affiant were in court and testify-

affidavit not based on personal knowledge has no probative value in a summary judgment motion. *See Commercial Union Insurance Company v. Albert Pipe & Supply Co., Inc.,* 484 F.Supp. 1153, 1157 (S.D.N.Y. 1980). Of course, the entire affidavit is not required to be stricken for a court is free to selectively disregard only the inadmissible paragraphs and consider the balance which is founded on the attorney's personal knowledge. *See United States v. Alessi,* 599 F.2d 513, 514–15 (2d Cir. 1979) (per curiam). An affidavit that does not measure up to the standards of Fed.R.Civ.Proc. 56(e) is subject to a motion to strike; and formal defects are waived in the absence of such a motion or other objection. 6 (Part 2) J. Moore, Moore's Federal Practice, ¶ 56.-22[1] at 56–1330 (2d ed. 1980) and cases cited therein. Although C.C.B. has not made such a motion to strike, the Court will entertain its memorandum argument as "an objection" to the Baker affidavit. *See CMS Industries, Inc. v. L.P.S. International, Ltd.,* 643 F.2d 289, 295 (5th Cir. 1981); *Becker v. Koza,* 53 F.R.D. 416, 419 (D.Neb.1971); *New Hampshire Fire Insurance Company v. Perkins,* 30 F.R.D. 382, 383 (D.Del.1962).

■ After narrating that Wegmans entered into an arrangement with C.C.B. to collect the Debtor's bad check debt, Mr. Baker's affidavit prefaces several paragraphs concerning that arrangement by the sentence "The following facts about this arrangement are known or *can easily be inferred* from available evidence." (Baker Affid. ¶ 7) (Emphasis added). That preface runs counter to the well-established rule that all evidence and factual inferences to be drawn from the evidence of a moving party must be construed in a light most favorable to the party opposing the motion for summary judgment. *See Adickes v. S.H. Kress & Company,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed. 142 (1970); *United States v. First National Bank of Circle,* 652 F.2d 882, 887 (9th Cir. 1981); 6 Moore's Federal Practice, *supra,* ¶ 56.15[3] at 56–469. The Baker affidavit's more

ing on the witness stand, would be admissible as part of his testimony. 6 (Part 2) J. Moore,

egregious nature is in the portion fraught with *his* findings of ultimate fact, conclusory statements, prayers for relief, conclusions of law, and argumentation. The affidavit is not the place for ultimate facts and conclusions of law, nor for argument of the party's cause. 6 (Part 2) Moore's Federal Practice, *supra,* ¶ 56.22[1], at 56–1316. Accordingly, the Court strikes paragraph Nos. 3, 4, 7, and 18 through 33 of the Baker affidavit.

### Statement of Undisputed Facts

Upon the sworn affidavits and exhibits of the Debtor; Mr. James M. Baker, Debtor's attorney; Mr. James A. Weller, credit manager of Wegmans; Mr. Donald Smith, C.C. B.'s attorney; and Mr. Hart A. Goldsmith, President of C.C.B., the Court finds the following facts undisputed.

1. Wegmans is a food market. In June and July of 1980, on seven (7) occasions, the Debtor purchased goods at Wegmans. Payment was made by personal checks. All these checks, totalling $245.93, were subsequently dishonored for insufficient funds upon presentment by Wegmans to the Debtor's bank, Onondaga Savings Bank. Wegmans hires and retains C.C.B. to collect its customers' dishonored checks.

2. No employee, officer, or director of Wegmans has any form of financial interest, direct or indirect in C.C.B. and there is the same independence of C.C.B. as to Wegmans.

3. The C.C.B. offers a complete range of collection services to a large clientele in the upstate New York region. Among the services, there are (1) a computerized account debtor correspondence service; (2) direct debtor contacts; (3) a location and seizure operation concerning debtor property to effect satisfaction of judgment; and (4) referrals to specialized collection attorneys, and more. The C.C.B. is located in Rochester, New York, while the Debtor lives the area of Syracuse, New York which is approximately seventy-five miles away.

Moore's Federal Practice, ¶ 56.22[1] at 56–1321 to 56–1322 (2d ed. 1980).

4. The arrangement between C.C.B. and Wegmans involves weekly meetings between a Wegmans employee and a C.C.B. representative at Wegmans offices wherein various delinquent customer accounts are discussed and a number of accounts are assigned to C.C.B. for collection. At that moment the C.C.B. representative then takes with him *all* the information relating to the particular account and commences collection.

5. The first step in this collection process is the mailing of a series of five communications to the customer, once a week, for five weeks. Unless the creditor-client (e.g., Wegmans) receives a positive response from the customer during the intervals, the letter is sent each week. In light of no customer response, C.C.B. does offer a second level of services.

6. C.C.B. first entered into its arrangement with Wegmans in 1978. At that time, Mr. Goldsmith showed Mr. Weller, Wegman's credit manager, examples of the five letters that would be sent to customers whose checks were dishonored. At such time, Mr. Goldsmith recommended to Mr. Weller that Wegmans start legal action in any case if the maker (customer) has not responded to any of the first three letters. Thus, C.C.B. had a "standing recommendation", applicable in all cases, that Wegmans start legal action after the third letter if no payments were received. At all relevant times when a C.C.B. representative met with a Wegmans' employee to discuss delinquent accounts, C.C.B. would ask whether there has been any response from or payment by any of the makers to whom C.C.B. was in communications. If there has been no response or payment, and if Wegmans has not decided to commence legal action, C.C.B. would continue contacting the maker. Thus, there was "regular communication" between C.C.B. and Wegmans.

7. The matter of collection of dishonored checks due Wegmans from this Debtor was turned over to C.C.B. for action on July 14, 1980. The first level of letters commenced July 17, 1980, and continued for the entire five-week period. These notices are the only occasion in which a third party in behalf of Wegmans contacted the Debtor. No second level of C.C.B. services were utilized by Wegmans. All subsequent collection efforts on the dishonored checks were directly from Wegmans.

8. The actual notices sent to the Debtor were not produced. The Debtor and Mr. Goldsmith present the Court a set of sample C.C.B. first-level notices (*See* Appendix I–V) which are admitted as comparable in content to the originals sent to the Debtor. (Goldsmith Affid. 3/16/81, ¶ 5).

9. The five communications vary in format and content. The first two communications are printed on short yellow paper with a heading "Urgent Message SPEED–O–GRAM". Their envelopes contained C.C.B.'s initials and address in the upper left hand corner and were sent by ordinary mail. The latter three letters bear a full letter size sheet with only C.C.B. heading and logo. These notices span from July 17, 1980 to about August 13, 1980.

10. Mr. Weller stated that "(A)ll the actions mentioned in the notices were indeed contemplated. Wegmans does and will take all the actions alluded to in the notices." (Weller Affid. 6/17/81 ¶ 6). The earlier Weller affidavit (3/19/81 Ex. G) contains numerous business records and summaries representing its regular business practice of filing criminal complaints against its customers for bad checks under the New York Penal Law.

11. The notices' demand for an amount including "service charge" originates from an application card ("CHECK FILE CARD") to Wegmans filled out by the Debtor on May 1, 1980. (Weller Affid. 3/19/81, Ex. I). This card contains the Debtor's signature, biographical information, and her checking account number. On this application card is an area of five lines under the heading "BAD CHECKS"; an area for "REMARKS"; and the singular question "Have you ever made out a check file card at another

Wegmans store?" which was unanswered. There is no reference on the card to any terms and/or conditions in any other documents. There is no mention of a service charge for bad checks on this card. There is no authorizing or assenting signature on behalf of Wegmans.

12. In response to the notices transmitted to the Debtor, the Debtor's husband wrote to Wegmans on July 24, 1980 (Weller Affid. 3/19/81 Ex. D) seeking to arrange a schedule of monthly payments of the amount owed on the dishonored checks. Wegmans responded to the husband's requests by transmitting a card (Baker Affid. Ex. F) which unequivocally stated Wegmans' policy which required full and immediate payment of all dishonored items. This card was mailed on or about August 6, 1980.

13. No further responses from the Debtor were made. On September 11, 1980, Wegmans formally protested the checks in issue by sending a Certificate of Protest and Notice of Protest to the Debtor's last known address. (Weller Affid. Ex. F).

14. On or about November 6, 1980 a "FINAL NOTICE" by Wegmans was sent to the Debtor. (Baker Affid. Ex. H). The notice made a demand for payment of $281.47 (sic) for the listed seven checks which included a service charge of $5.00 per check. This direct communication gave the Debtor until November 17, 1980 to pay her outstanding checks before the checks "will be forwarded to our lawyers and/or police agency for the full enforcement of our rights." This notice followed the Debtor's filing of her bankruptcy petition on October 16, 1980.

15. Mr. Weller's affidavit (3/19/81 ¶ 6(g) p. 8–9) narrates what constitutes the costs of processing a bad check to which the $5.00 "service charge" is to offset: $1.00—Merchants Bank for returned

check; $4.10 fee to C.C.B. for first level notices; $3.00 Wegmans' Credit Dep't personnel; and $1.00 Wegmans' in-store personnel.

16. The Wegmans' communications in paragraphs Nos. 13 and 14 *supra*, were in envelopes and otherwise delineated Wegmans Food Markets, Inc. as the sender.

17. The Debtor's two counterclaims against Wegmans and C.C.B., respectively, seek no actual damages.

## DISCUSSION

### The *FDCPA* Counterclaims

In 1977 the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.* (1976) was amended by the addition of a new title VIII, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (Supp. IV 1980). The FDCPA was enacted to prohibit abusive practices by debt collectors. The FDCPA creates statutory private causes of action for consumers [11] to pursue against "debt collectors". *See* FDCPA § 813(a), 15 U.S.C. § 1692k(a). Before a consumer-plaintiff can pursue his various causes of action under the FDCPA, the threshold questions are (1) is the subject "debt" recognized under the FDCPA, and (2) is the named defendant a "debt collector" as defined under the FDCPA. Affirmative findings in those two instances allow the court to look at the particular collection activities which are allegedly violative of the Act.[12]

### I.

Upon this record of affidavits it is undisputed that the Debtor's "debt" arises from several purchases of food paid by personal checks. The C.C.B. poses an argument that its activities concerning the collection of the Debtor's outstanding dishon-

**11.** Section 803(3) of the FDCPA reads: "(3) The term 'consumer' means any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3).

**12.** Two United States district courts have held the question of a defendant qualifying as a

"debt collector" under the FDCPA to be a question of *subject matter jurisdiction. See Gary v. Spires*, 473 F.Supp. 878, 882 (D.S.C.1979); *Kizer v. Finance America Credit Corporation*, 454 F.Supp. 937, 939 (N.D.Miss.1978). I disagree.

ored checks are not activities that may be construed as collection of a "debt" as defined under the FDCPA. The focus of C.C.B.'s argument is that the dishonored checks represent a debt separate and distinct from the debt associated with the Debtor's consumer purchase of food from Wegmans which *is* covered by the Act's definition of "debt".

 I must reject this narrow reading of the FDCPA's operative definition of "debt". Section 803(5) of the Act reads

The term "debt" means *any* obligation or *alleged obligation of a consumer to pay money arising out of a transaction in which the* money, property, insurance, or services which are *subject of the transaction are primarily for personal, family, or household purposes*, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5) (Emphasis added). Clearly, a check embodies a statutory contract [13] (i.e., a secondary legal obligation) to pay the amount of the check in money [14] conditioned by the check being dishonored. If the check is dishonored, the creditor may sue either on the dishonored check *or* the underlying debt. *See Mansion Carpets, Inc. v. Marinoff*, 24 A.D.2d 947, 265 N.Y.S.2d 298, 299 (1st Dep't 1965). *See generally* Bailey, *Brady on Bank Checks*, § 4.5 (5th ed. 1979). I find as a matter of law that dishonored checks (1) are legal obligations to pay money arising out of a transaction when checks are the form of payment, and therefore (2) qualify as a "debt" under the FDCPA. *Cf. Carrigan v. Central Adjustment Bureau, Inc.*, 494 F.Supp. 824, 826 (N.D.Ga.1980) (federal student loan for tuition qualified as a "debt" under FDCPA).

The second inquiry requires the Court to find as a matter of law whether Wegmans and C.C.B. are each subject to liability under the FDCPA as a "debt collector" or otherwise. The definition of debt collector is set forth in § 803(6) which reads:

The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (G) of the last sentence of this paragraph, *the term [debt collector] includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts...* The term [debt collector] does *not* include—

(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

15 U.S.C. §§ 1692a(6), (6)(A) (Bracketed inserts and emphasis added).

The various duties and liabilities under the FDCPA §§ 804—811, 15 U.S.C. §§ 1692b–1692i, apply only to a "debt collector". Yet, liability under the Act is imposed in one instance on a party not qualifying as a "debt collector". Under § 812 it is provided that:

§ 812. Furnishing certain deceptive forms

(a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the *false belief* in a consumer *that a person other than the creditor* of such consumer *is participating in the collection of or in an attempt to collect a debt* such consumer allegedly owes such creditor, *when in fact such person is not so participating.*

(b) *Any person* who violates this section *shall be liable* to the same extent and in the same manner as a debt collector is liable under Section 813 for failure to comply with a provision of this title.

15 U.S.C. § 1692j (Emphasis added). The legislative history elaborates the background and purpose of the above section. It states:

---

**13.** *See* N.Y.U.C.C. §§ 3–104(2)(b), 3–413(2) (McKinney 1964).

**14.** *See id.* § 3–104(1)(b).

*Section 812. Furnishing certain deceptive forms.*—It is made unlawful to compile, design, and furnish forms knowing that they will be used to create the *false impression that a third person is collecting a debt.*

S.Rep.No.382, 95th Cong., 1st Sess. 8 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad. News 1702 (Emphasis added). The Senate Report's explanation of the legislation under the topic of "Furnishing deceptive forms", states that

> Another common collection abuse is known colloquially as "flat-rating." A "flat-rater" is one who sells to creditors a set of dunning letters bearing the letterhead of the flat-rater's collection agency and exhorting the debtor to pay the creditor at once. *The creditor sends these letters to his debtors, giving the impression that a third party debt collector is collecting the debt. In fact,* however, *the flat-rater is not in the business of debt collection,* but merely sells dunning letters.
>
> This bill prohibits the practice of flat-rating because of its inherently deceptive nature. The prohibition on furnishing such forms does not apply, however, to printers and custom stationery sellers who innocently print or sell such forms without knowledge of their intended use.

*Id.* at 5, *reprinted in* 1977 U.S.Code Cong. & Ad.News 1699 (Emphasis added). In spite of the legislative history, the Debtor argues for an imposition of liability on *both* Wegmans and C.C.B. The contention is that the computerized C.C.B. print-out notices are such minimal participation by C.C.B. that it should be viewed as a "flat-rater" and Wegmans viewed as a creditor-debt collector "who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person (i.e., C.C.B.) is collecting or attempting to collect such debts."

■ From the wording of the statutory provisions and related legislative history I find the scheme of the FDCPA is to impose liability on either (1) a creditor, redefined as a "debt collector" and his "flat-rater", or (2) a debt collector but *not* its creditor-client. The former and latter situations are mutually exclusive. I reject the Debtor's implicit contention that the courts were burdened with measuring the degree of a collection agency's participation in the collection process. The draftsmen clearly stated that "The primary persons intended to be covered are independent debt collectors." S.Rep.No.382, 95th Cong., 1st Sess. 3 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 1697. One need only qualify under the definition of "debt collector" to have the Act's duties attach to one's conduct. Here, C.C.B.'s minimal conduct of beckoning the Debtor to send payment to Wegmans still qualifies it to be a debt collector because it *"uses. . . the mails* in any business the principal purpose of which is the collection of any debts, or who *regularly* collects or *attempts to collect,* directly or *indirectly, debts owed* or due or asserted to be owed or due *another. . ."* FDCPA § 803(6), 15 U.S.C. § 1692a(6) (Emphasis added). Also, the undisputed facts (¶ 3) narrate C.C.B.'s regular and extensive collection agency services. The C.C.B. is a "debt collector" subject to liability for violations of the FDCPA.

■ Because C.C.B. qualifies as a debt collector, Wegmans, its creditor-client, is mutually excluded from liability as a "debt collector" under § 803(6), 15 U.S.C. § 1692a(6). The portion of the statutory language which re-defines a creditor to be a debt collector is not applicable to Wegmans. The undisputed facts clearly portray an employment of C.C.B. *to send* the notices now in issue. In turn, I conclude that Wegmans (1) does not qualify as a "debt collector" under the FDCPA; and therefore (2) is not subject to any liability in the counterclaim premised on the FDCPA.

II.

■ The mailed notices by C.C.B. constitute C.C.B.'s total activity and involvement with the Debtor. The Debtor's amended answer and counterclaims allege that C.C.B. has violated §§ 806, 807, 807(2)(A), 807(4), 808, 809(a), and 812(a) of the FDCPA. At

the onset, my prior conclusion that C.C.B. is a debt collector, not a flat-rater, under the FDCPA eliminates alleged C.C.B. liability under § 812(a), 15 U.S.C. § 1692j(a).

### A.

The restrictions on debt collectors in § 806 is a general standard including but not limited by six (6) specific types of prohibited conduct. The section begins: "A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of the debt." 15 U.S.C. § 1692d. This general language standard for prohibited practices is said to enable the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed. S.Rep.No.382, 95th Cong., 1st Sess. 4 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 1698. The Debtor only relies on the general standard. The Debtor alleges that by "continually threatening her with criminal prosecution" the C.C.B. notices qualify under the general standard. At this juncture, the Court takes judicial notice that the issuance of bad checks is a class B misdemeanor under the New York Penal Law. *See* N.Y.Penal Law, § 190.05 (McKinney 1975).[15]

■ In reviewing the notices I find that the first mention or connotation of criminal prosecution appears in the third weekly notice as evidenced by the statement "Court costs and *fines* could be assessed... You might even be subject to criminal prosecution which could lead to a possible jail sentence." (Emphasis added). The fourth and fifth notices speak of C.C.B. recommendations to the client, i.e., Wegmans, to "contact his (Wegmans) attorney with respect to proceedings against you to the fullest ex-

tent of the law," and "we are urging our client to contact his attorneys to consider *prosecuting you* to the fullest extent of the law," respectively. (Emphasis added). Therefore, the notices do *not continually* speak to criminal prosecution until the third week. I find them not to be harassing for the topic of criminal sanctions was not initially and persistently mentioned. Considering that state law provides criminal liability with an affirmative defense being satisfaction by the bad check's drawer with ten (10) days of dishonor by the drawee, *see* N.Y.Penal Law, *supra*, § 190.15(1), it is not oppressive to mention to a consumer that a creditor-client will be advised to assert his rights after the first two weekly notices have engendered no satisfaction of the dishonored checks. The remaining issue under § 806 is whether the language of the notices can be said to "abuse" the Debtor. Although the notices do partake of a progressively moderate to urging tone to the Debtor, I do not find this particular language to be wrongful in speech, coarsely disparaging, or maligning. *See* Black's Law Dictionary (5th ed. 1979). The use of this language as a natural consequence should not impart abuse to the ordinary and reasonable consumer.[16]

### B.

■ The Debtor alleges violations under § 807's general prohibitory language which states "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt". 15 U.S.C. § 1692e. The Debtor contends that the first two C.C.B. notices which have large headings "SPEED–O–GRAM" and "Urgent Message" are clearly deceptive communications.

---

**15.** *See Lamar v. Micou*, 114 U.S. 218, 223, 5 S.Ct. 857, 859, 29 L.Ed. 94 (1885); *Saffold v. McGraw-Edison Company*, 566 F.2d 621, 623 (8th Cir. 1977) (federal courts must take judicial notice of the statutory and common law of any state of the union without pleading or proof.)

**16.** *Cf. Blackwell v. Professional Business Services*, 526 F.Supp. 535, 537 (N.D.Ga.1981) (court applies reasonable consumer standard for de-

termining whether particular language was deceptive or misleading under § 807, 15 U.S.C. § 1692e). *But cf. Bingham v. Collection Bureau, Inc.*, 505 F.Supp. 864, 870 (D.N.D.1981) (court uses standard of "whether it is more likely than not so that debtors on the low side of reasonable capacity who read a given notice...read into the message oppressiveness, falsehood, or threat.")

The Debtor cites an analogous finding of deception by simulated telegram format under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which was affirmed in the case of *Trans World Accounts, Inc. v. F.T.C.*, 594 F.2d 212 (9th Cir. 1979). I also conclude that such undisputed telegram simulations are deceptive formats as was observed in *Trans World, id.* at 214 n.1 and 215 n.2, when directly sent in ordinary mail by a debt collector. I find them violative of § 807 of the FDCPA.

■ The issue of whether the contents of all five notices are also violative of § 807(2)(A) by virtue of each notice containing "(2) the false representation of (A) the...amount...of any debt" requires close examination of the exhibits. 15 U.S.C. § 1692e(2)(A). The notices do include a "service charge" in the listed total. The Debtor argues (1) she did not agree to any service charge for bad checks, and, therefore, (2) the amount listed is false.

Neither Wegmans nor C.C.B. has presented any evidence premised on direct personal knowledge, *see* Rule 56(e) of the Fed.R.Civ. Proc., as to the Debtor's May 1, 1980 execution of the check cashing application or any related oral agreements. It is undisputed that the check cashing application makes *no* reference to any service charges for bad checks. The Weller affidavit (6/17/81) states that a posted notice concerning the $5.00 service charge for bad checks was in place when the Debtor made out her application. This fact does not raise a disputed fact as to incorporation of alleged contractual terms unless there is evidence to refute the Debtor's affidavit statements that she was neither told by anyone nor ever noticed any sign at Wegmans that said there was a "bad check $5.00 service charge". Absent some proof of considering the service charge term, in a legally binding obligation, either orally or in the check cashing applica-

tion, the right to service charges is baseless and false. No service charge amount is owed to Wegmans.

Concerning the notices' discussion of C.C.B. recommendations [17] to Wegmans on criminal action to be taken against the Debtor, the Debtor invokes § 807(4) of the Act. That provision considers a specific type of violative conduct to be

> (4) The representation or *implication* that nonpayment of any debt will result in the arrest or imprisonment of any person... *unless* such action *is lawful and* the debt collector or *creditor intends to take such action.*

15 U.S.C. § 1692e(4) (Emphasis added). This violative conduct provision contains two sanctioning conditions subsequent, i.e., if the action of arrest, etc. is (1) lawful, and (2) shown to have been intended to be taken. *Id.*

■ On the first issue, it is clear to the Court that § 190.05 of the New York Penal Law allows for misdemeanor prosecution if one utters a bad (returned) check. The second condition requires undisputed proof by either of the cross-movants whether or not Wegmans did intend to prosecute against this Debtor. The Weller affidavits and exhibits speak to the Wegmans policy and practice of instituting criminal proceedings against its customers for issuing bad checks. The Debtor has not presented any evidence to refute or allow reasonable men to draw differing inferences as to whether Wegmans similarly would institute criminal proceedings against the Debtor. *See Empire Electronics Co., Inc. v. United States*, 311 F.2d 175, 180 (2d Cir. 1962). The Court is mindful that these are summary judgment motions under consideration. It was observed in *Hahn v. Sargent*, 523 F.2d 461 (1st Cir. 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) that:

---

**17.** The third through fifth notices of C.C.B. progressively use language such as "(W)e will recommend that our client immediately consider initiating such action as may be necessary to recover this debt... You might even be subject to criminal prosecution which could in turn lead to a possible jail sentence"; "If you disregard this notice... in 72 hours we will recommend to our client that he contact his attorneys with respect to proceedings against you to the fullest extent of the law."; "(W)e are urging our client to contact his attorneys to consider prosecuting you to the fullest extent of the law." *See* Appendix III–V.

State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind. (citation omitted) But that does not mean that a party against whom summary judgment is sought is entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim. (citation omitted).

523 F.2d at 468. I must conclude it is undisputed that the creditor, although not immediately, intended to institute criminal proceedings as its last resort to recover the amounts of the bad checks. Therefore, both conditions subsequent of § 807(4) are clearly established and the implicit language of the C.C.B. notices as to criminal proceedings does not violate § 807(4) of the Act. 15 U.S.C. § 1692e(4). For the same reasons, I summarily dismiss the Debtor's allegations under § 807(5), 15 U.S.C. § 1692e(5).

### C.

■ Section 808 speaks to "Unfair practices" conducted by a debt collector which are violative of the FDCPA. The Debtor alleges that the C.C.B. notices are violative of the general language standard in § 808 which prohibits a debt collector's "use of unfair and unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. Sending these written notices by ordinary mail is the "means" employed and thus qualifying under § 808. I do not find the means to be ostensibly unfair or unconscionable. Yet, I do find that an omission in the notices' contents transforms the notices to an unfair practice. These notices have no C.C.B. return mailing address. The Debtor has no *direct* means to contact the C.C.B. organization. Such a consequence clearly illustrates the implicit necessity for a return address on any debt collector's communications to a consumer.

In the case at bar, the debt collector is situated in a distant city. The Debtor could not independently ascertain by local inquiry the debt collector's address. The fact that such address appears on the sending envelopes is not a sufficient substitute as it is physically separate and distinct from the communication. The absence of a return address on a debt collector's notices effectively nullifies the consumer's rights set out in § 805(c) and § 809(b) of the Act, 15 U.S.C. §§ 1692c(c), 1692g(b), which arise from a consumer's *written notification to the debt collector.* The lack of a return address on the notice is an unfair practice violative of § 808 of the Act. Contrary to the Debtor's memorandum, there are no pleading allegations against C.C.B. under § 808(1) of the Act.

### D.

■ The C.C.B. notices to the Debtor do qualify as "communications . . . in connection with the collection of a debt" under § 803(2) of the FDCPA.[18] Section 809(a) of the Act requires a particular "validation notice" with specified contents be sent with the initial debt communication to a consumer or within five days thereof. *See* FDCPA § 809(a)(1)–(5), 15 U.S.C. § 1692g(a)(1)–(5). It is undisputed that no separate validation notice has been sent to the Debtor nor do the C.C.B. notices in issue contain *all* the required statements of a validation notice. The C.C.B. has violated, in particular, § 809(a)(3)–(5), 15 U.S.C. § 1692g(a)(3)–(5).

### III.

### *N.Y. Counterclaims*

The Debtor's second counterclaim against both Wegmans and C.C.B. is premised on § 349(a) of the New York General Business Law which is contained in Article 22–A. This article is entitled "CONSUMER PROTECTION FROM DECEPTIVE ACTS

---

**18.** Section 803(2), 15 U.S.C. § 1692a(2) reads: "(2) The term 'communication' means the conveying of information regarding a debt

directly or indirectly to any person through any medium.["]

AND PRACTICES." Section 349(a) was enacted in 1970. 1970 N.Y.Laws, ch. 43, § 2. Section 349(a) reads in broad language that "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y.Gen.Bus.Law, § 349(a) (Supp. McKinney 1981). The section was subsequently amended to provide a private right of action to "any person who has been injured by reason of any violation of this section." N.Y.Gen.Bus.Law, § 349(h); *See* 1980 N.Y. Laws, ch. 346, § 1.

### A.

■ The language of § 349(a) is very broad in potential application. A New York court has articulated the section's scope by stating that

> It is thus clear that the legislative purpose in enacting section 349 of the General Business Law was to follow in the steps of the Federal Trade Commission with respect to the interpretation of deceptive acts and practices outlawed in section 5 of the Federal Trade Commission Act...

*State of New York by Lefkowitz v. Colorado State Christian College of the Church of the Inner Power, Inc.,* 76 Misc.2d 50, 54, 346 N.Y.S.2d 482, 487 (Sup.Ct.Sp.T.N.Y.Co. 1973). Section 814(a) of the FDCPA provides that the Federal 'Trade Commission may exercise its Federal Trade Commission Act functions and powers under the FDCPA because "a violation of this title shall be deemed an unfair or deceptive act or practice in violation of that [Federal Trade Commission] Act." 15 U.S.C. § 1692*l* (a) (Insert added). Accordingly, my finding that C.C.B.'s simulated telegram formats are deceptive under the FDCPA is synonymous with a violation of § 5 of the Federal Trade Commission Act and, therefore, subjects C.C.B. to concurrent liability under § 349(a) of the New York General Business Law.

19. *See* FDCPA § 814(d), 15 U.S.C. § 1692*l*(d).

### B.

■ The Wegmans' three notices to the Debtor are its total direct activity with the Debtor. Because Wegmans does not qualify as a debt collector under the facts of this case, its conduct is not violative of the FDCPA. In turn, I cannot find § 814(a) of the Act applicable to Wegmans. The Debtor's memorandum (p. 15) argues that the Federal Trade Commission has "consistently taken the position that a *creditor* which engages in conduct prohibited by the FDCPA is guilty of violating § 5 [Federal Trade Commission Act]." (Emphasis in original) (Insert added). The Debtor's attorney cites no authority for that assertion except himself. Although there do exist partially valid Federal Trade Commission regulations [19] concerning "GUIDES AGAINST DEBT COLLECTION DECEPTION", *see* 16 C.F.R. § 237 *et seq.* (revised as of 1/1/81), it remains for the Commission, not this Court, to enforce such regulations premised on § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The Debtor has failed to show this Court that *as a matter of law* there is any violation of § 5 of the Federal Trade Commission Act by Wegmans' deceptive conduct in the collection of debts owing to it.

### C.

■ The N.Y. General Business Law § 349 does operate independently from federal law. The New York state courts have not addressed the question of § 349(a)'s application to creditor collection practices. *Cf.* N.Y.Gen.Bus.Law, § 600 *et seq.* (Supp. McKinney 1981) (misdemeanor liability for any principal creditor or his agent who violates its statutory provisions concerning "DEBT COLLECTION PROCEDURES"). In fact, there is a dearth of cases concerning § 349. The New York courts have stated the standard for a finding of deception:

> The test is not whether th average man would be deceived. Sections 349 and 350 of the General Business Law were enacted to safeguard the 'vast multitude which includes the ignorant, the unthinking and the credulous' (citation omitted).

*People of the State of New York by Lefkowitz v. Volkswagen of America, Inc.*, 47 A.D.2d 868, 366 N.Y.S.2d 157 (1st Dep't 1975); *Quinn v. Aetna Life and Casualty Co.*, 96 Misc.2d 545, 554, 409 N.Y.S.2d 473 (Sup.Ct.Sp.T. Queens Co. 1978); *see also Guggenheimer v. Ginzburg, d/b/a The Webster's Dictionary Company*, 43 N.Y.2d 268, 273, 401 N.Y.S.2d 182, 372 N.E.2d 17 (1977). My previous finding that there exists no binding legal obligation from the Debtor to Wegmans to pay bad check "service charges" contradicts the truth and validity of the assertions in Wegmans "FINAL NOTICE" that "It is imperative that this check, plus a $5.00 service charge for each check, be paid... This is your final notice before you are assessed with interest, collection expenses, and/or court costs." (Baker Affid. Ex. H).

Wegmans contends that their conduct in collecting outstanding debts from customers is not their business, trade, commerce, or furnishing of a service under § 349(a), and therefore the statute is *not* applicable to any deceptive collection techniques by Wegmans. Wegmans contention overlooks the fact that one reason the Debtor made her purchases at Wegmans is because it offered a check cashing service. That service is a facet of Wegmans inducing purchases beyond a customer's present cash on hand. It promotes Wegmans business of selling merchandise. Yet, the conditions of payment are not fully disclosed in the check cashing application. The language of the final notice would impart to the average consumer (never mind the ignorant, unthinking or credulous) that such remittances of additional service charges are as mandatory and absolute as the face value of the dishonored checks. Under the undisputed facts of this case, these Wegmans representations clearly deceive the customer as to his ultimate legal liability for dishonored checks to a merchant. Sending this standard notice/demand is a deceptive act or practice which seeks to enforce nonexistent payment rights against a consumer. It appears violative of § 349(a) of the New York General Business Law.

## IV.

### *Damages*

The Debtor seeks no actual damages for the C.C.B. violations. Nevertheless, under the FDCPA the Debtor is entitled to damages. Under § 813(a) of the Act it is provided in relevant part:

(a) ... any debt collector who fails to comply with any provision of this title with respect to any person is liable to such person in an amount equal to the sum of—

(2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1000;

\* \* \* \* \* \*

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court...

15 U.S.C. § 1692k(a)(2)(A), (a)(3). The section also instructs the courts as to the considerations in determining the "amount of liability" for additional damages in any individual action. Among other relevant factors, the court is to consider (1) the frequency and persistence of noncompliance by the debt collector; (2) the nature of such noncompliance; and (3) the extent to which such noncompliance was intentional. FDCPA § 813(b)(1), 15 U.S.C. § 1692k(b)(1). With all the Debtor's alleged violations addressed, a determination of additional damages is appropriate as a matter of law.

In the case at bar I have found that several violations attach to each of the once-a-week notices sent to the Debtor. The notices' frequency and persistence is average. The nature of such noncompliance was the notices' deceptive and unfair format and their failure to have statutory validation notices. These violations partake of the less egregious and harmful debt collector abuses addressed by the FDCPA. It is never disputed that all five notices were knowingly sent with prior knowledge of

their exact contents. The FDCPA has been effective law since about March 20, 1978,[20] and therefore, I find it incumbent on C.C.B. to have had familiarity with its provisions and sufficient access to legal counsel to conform its notices to the statutory requirements.

 I set the additional damages for the Debtor under the FDCPA at $300.00. I find that in light of no actual damages, the Debtor is entitled to $50.00 from C.C.B. pursuant to § 349(h) of the New York General Business Law. The notices from Wegmans to the Debtor also have been found to violate § 349(a) of the New York General Business Law. Although they created no actual damages, damages are set at $50.00 pursuant to § 349(h). The Debtor may be given an award of reasonable attorney's fees against C.C.B. and Wegmans pursuant to § 349(h) of the New York General Business Law, and is entitled to costs of the FDCPA action and a reasonable attorney's fee from C.C.B. pursuant to § 813(a)(3) of the Act, 15 U.S.C. § 1692k(a)(3).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over the Debtor's counterclaims against C.C.B. and Wegmans. In accordance with the undisputed material facts, aforesaid principles of law, and interpretations of the statutory provisions of the FDCPA and § 349(a) of the New York General Business Law, I find as a matter of law that (1) Wegmans is not a proper party-defendant under the FDCPA; (2) Wegmans is liable under § 349(a) of the New York General Business Law; (3) the C.C.B. is subject to liability under the FDCPA and has violated § 807 (simulated telegram format), § 807(2)(A) (false representation of amount of debt), § 808 (lack of return address on notices), and § 809(a)(3)–(5) (required statements of validation notices) of the FDCPA; and (4) C.C.B. has incurred liability under § 349(a) of the New York General Business Law. It is therefore,

ORDERED, that Eustrah, Inc., d/b/a Continental Collection Bureau's motion to dismiss the Debtor's FDCPA counterclaim for lack of subject matter jurisdiction is denied; and it is further

ORDERED, that Wegmans Food Markets, Inc.'s motion for summary judgment dismissing the Debtor's first and second counterclaims is granted as to the first counterclaim based upon the failure to state a claim for which relief can be granted and denied as to the second counterclaim; and it is further

ORDERED, that the Debtor's motion for summary judgment against Wegmans for liability on its first and second counterclaims is denied as to the first counterclaim and granted as to the second counterclaim; and it is further

ORDERED, that the Debtor's motion for summary judgment against Eustrah, Inc., d/b/a Continental Collection Bureau, on its first counterclaim for liability under §§ 807, 807(2)(A), 808, and 809(a) of the Fair Debt Collection Practices Act is granted; all other liability under the Act is denied and dismissed as a matter of law; and it is further

ORDERED, that the Debtor's motion for summary judgment against Eustrah, Inc., d/b/a Continental Collection Bureau on its second counterclaim under § 349(a) of the New York General Business Law, is granted; and it is further

ORDERED, that the Eustrah, Inc., d/b/a Continental Collection Bureau motion for summary judgment dismissing the Debtor's first and second counterclaims and requesting attorney's fees pursuant to § 813(a)(3) of the Fair Debt Collection Practices Act is denied in its entirety; and it is further

ORDERED, that the Debtor's additional and statutory damages against Eustrah, Inc., d/b/a Continental Collection Bureau are fixed at $300.00 and $50.00 pursuant to Fair Debt Collection Practices Act § 813(a)(2), 15 U.S.C. § 1692k(a)(2) and

---

**20.** *See* FDCPA § 818, 15 U.S.C. § 1692 note.

§ 349(h) of the New York General Business Laws, respectively; and it is further

ORDERED, that the Debtor is awarded statutory damages of $50.00 against Wegmans Food Markets, Inc. pursuant to § 349(h) of the New York General Business Law; and it is further

ORDERED, that Wegmans Food Market, Inc. is denied any and all court costs; and it is further

ORDERED, that the Debtor's attorney prepare, serve, and file with the Court, copies to Wegmans Food Market, Inc. and Eustrah, Inc., d/b/a Continental Collection Bureau, an itemized affidavit of attorneys fees with actual work apportioned between the Fair Debt Collection Practices Act counterclaim and the New York General Business Law counterclaim, with an application for allowance under the local rules, within twenty (20) days of this judgment.

## APPENDIX I

| URGENT MESSAGE | SPEED-O-GRAM | 10/09/80 |

```
 REMIT TO-
 DEBTOR CLIENT
 ADDRESS ADDRESS
 ADDRESS ADDRESS
 ADDRESS ADDRESS

 AMOUNT DUE- 1,000.00
 (INCLUDES SERVICE CHARGE)
 RE- SAMPLE CLAIM

 THIS IS A COURTESY NOTICE TO INFORM YOU THAT YOUR
 RETURNED CHECK HAS BEEN REFERRED TO THIS AGENCY FOR
 ACTION. OUR CLIENT HAS REQUESTED THAT YOU BE ALLOWED 5
 DAYS IN WHICH TO TAKE CARE OF THIS MATTER. IT IS OUR
 HOPE THAT YOU WILL CONTACT OUR CLIENT DURING THIS PERIOD
 IN ORDER TO COVER THIS APPARENT OVERSIGHT.
 TO INSURE PROPER CREDIT PLEASE MAKE YOUR PAYMENT
 DIRECTLY TO OUR CLIENT. DO NOT CONTACT CONTINENTAL
 COLLECTION BUREAU OR ANY OF ITS OFFICES.

 CK/1 CONTINENTAL COLLECTION BUREAU

 FOR QUESTIONS AND INQUIRIES PLEASE CONTACT-
 CLIENT AT AREA CODE-PHONE
```

APPENDIX II

URGENT MESSAGE SPEED-O-GRAM 10/09/80..

| | REMIT TO- |
|---|---|
| DEBTOR | CLIENT |
| ADDRESS | ADDRESS |
| ADDRESS | ADDRESS |
| ADDRESS | ADDRESS |

AMOUNT DUE- 1,000.00
(INCLUDES SERVICE CHARGE)
RE- SAMPLE CLAIM

 YOUR FAILURE TO MAKE GOOD THE CHECK THAT YOU HAVE
GIVEN OUR CLIENT HAS BEEN BROUGHT TO OUR ATTENTION.
SINCE YOUR 5 DAY COURTESY PERIOD HAS NOW EXPIRED, YOU
MUST TAKE CARE OF THIS MATTER IMMEDIATELY. DISREGARD OF
A FINANCIAL OBLIGATION MEANS THAT PEOPLE WHO PAY THEIR
DEBTS ON.TIME WILL ULTIMATELY BE THE ONES WHO PAY THE
PRICE. PLEASE HELP ALL OF US HOLD DOWN INFLATION. USE
YOUR GOOD JUDGEMENT AND COVER YOUR RETURNED CHECK TODAY.
 MAKE ALL PAYMENTS DIRECTLY TO OUR CLIENT. DO NOT CON-
TACT CONTINENTAL COLLECTION BUREAU OR ANY OF ITS
OFFICES.

CK/2 CONTINENTAL COLLECTION BUREAU

 FOR QUESTIONS AND INQUIRIES PLEASE CONTACT-
 CLIENT AT AREA CODE-PHONE

APPENDIX III

 Continental Collection Bureau

10/09/80

```
DEBTOR
ADDRESS
ADDRESS
ADDRESS
```

```
REMIT TO-
CLIENT AMOUNT DUE- 1,000.00
ADDRESS (INCLUDES SERVICE CHARGE)
ADDRESS RE- SAMPLE CLAIM
ADDRESS
```

YOUR FAILURE TO CONTACT OUR CLIENT IS NOW A VERY SERIOUS MATTER. IF YOU DO NOT MEET YOUR LEGAL OBLIGATION WE WILL RECOMMEND THAT OUR CLIENT IMMEDIATELY CONSIDER INITIATING SUCH ACTION AS MAY BE NECESSARY TO RECOVER THIS DEBT. WE WOULD LIKE TO MAKE SURE THAT YOU ARE FULLY AWARE OF THE POTENTIAL CONSEQUENCES OF YOUR ACTION. COURT COSTS AND FINES COULD BE ASSESSED WHICH WOULD MEAN THAT YOU WOULD HAVE TO PAY MUCH MORE THAN YOU ALREADY OWE. IN ADDITION, YOU MIGHT EVEN BE SUBJECT TO CRIMINAL PROSECU-TION WHICH COULD IN TURN LEAD TO A POSSIBLE JAIL SENTENCE. WE STRONGLY URGE THAT YOU AVOID ADDITIONAL RISKS AND TAKE CARE OF YOUR BAD CHECK TODAY.
MAKE YOUR PAYMENT DIRECTLY TO OUR CLIENT. DO NOT CONTACT CONTINENTAL COLLECTION BUREAU OR ANY OF ITS OFFICES.

CK/3

 FOR QUESTIONS AND INQUIRIES PLEASE CONTACT-
 CLIENT AT AREA CODE-PHONE

───────────────── *Nationwide Collection Bureau* ─────────────────

APPENDIX IV

 **Continental Collection Bureau**

10/09/80

```
DEBTOR
ADDRESS
ADDRESS
ADDRESS
```

```
REMIT TO-
CLIENT AMOUNT DUE- 1,000.00
ADDRESS (INCLUDES SERVICE CHARGE)
ADDRESS RE- SAMPLE CLAIM
ADDRESS
```

IN SPITE OF THE FACT THAT YOU HAVE HAD THE BENEFIT OF PRIOR NOTICES, YOU HAVE NOT SEEN FIT TO CONTACT OUR CLIENT TO COVER THE BAD CHECK YOU WROTE. IF YOU DISREGARD THIS NOTICE AND DO NOT TAKE CARE OF THIS MATTER IN 72 HOURS HE WILL RECOMMEND TO OUR CLIENT THAT HE CONTACT HIS ATTORNEYS WITH RESPECT TO PROCEEDINGS AGAINST YOU TO THE FULLEST EXTENT OF THE LAW.

AT THIS POINT YOU MUST ALSO CONSIDER WHAT WILL HAPPEN IF YOUR CREDIT RATING BECOMES IMPAIRED. THIS WOULD MEAN THAT YOU COULD NOT BORROW MONEY OR PURCHASE ITEMS ON TIME PLANS. IN OUR CREDIT CONSCIOUS ECONOMY YOU CAN SEE WHAT THIS WOULD MEAN FOR THE FUTURE. DON'T RISK THE LOSS OF THIS VALUABLE ASSET BECAUSE ONCE LOST IT IS PRACTICALLY IMPOSSIBLE TO RECOVER. COVER YOUR BAD CHECK NOW.

MAKE ALL PAYMENTS DIRECTLY TO OUR CLIENT. DO NOT CONTACT CONTINENTAL COLLECTION BUREAU OR ANY OF ITS OFFICES.

CK/4

FOR QUESTIONS AND INQUIRIES PLEASE CONTACT-
CLIENT AT AREA CODE-PHONE

1022

## APPENDIX V

 Continental Collection Bureau

10/09/80

```
DEBTOR
ADDRESS
ADDRESS
ADDRESS

REMIT TO-
CLIENT AMOUNT DUE- 1,000.00
ADDRESS (INCLUDES SERVICE CHARGE)
ADDRESS RE- SAMPLE CLAIM
ADDRESS
```

 YOU HAVE DISREGARDED OUR REPEATED CONTACTS WITH RESPECT TO THE ABOVE BAD CHECK. AS A RESULT, WE ARE URGING OUR CLIENT TO CONTACT HIS ATTORNEYS TO CONSIDER PROSECUTING YOU TO THE FULLEST EXTENT OF THE LAW. IT IS OUR HOPE THAT SUCH ACTION WILL BE INSTITUTED BECAUSE BAD DEBTS COST ALL OF US MONEY IN THE FORM OF HIGHER PRICES. PEOPLE WHO CAUSE BAD DEBTS SHOULD BE MADE TO PAY BY WHATEVER LEGAL MEANS AVAILABLE SO THAT THE REST OF US DO NOT HAVE TO PAY FOR THEIR IRRESPONSIBILITY.

 IN SPITE OF OUR REPEATED WARNINGS THAT LEGAL ACTION CAN BE VERY EXPENSIVE, YOU APPEAR WILLING TO UNDERTAKE THE POTENTIAL EXPENSE IN ADDITION TO THE MONEY THAT IS ALREADY OWED.

 TO INSURE PROPER CREDIT PAYMENT MUST BE MADE DIRECTLY TO OUR CLIENT. DO NOT CONTACT CONTINENTAL COLLECTION BUREAU OR ANY OF ITS OFFICES.

CK/5

 FOR QUESTIONS AND INQUIRIES PLEASE CONTACT-
 CLIENT AT AREA CODE-PHONE