OPINION OF THE COURT
Angelo Graci, J.
In this action for a permanent injunction, plaintiffs move for a preliminary injunction to restrain the defendants from publishing or causing to be published certain advertising copy on the ground that said copy is calculated to influence potential jurors, thereby depriving the plaintiffs of their constitutional right to an impartial jury. Defendants cross-move for an order dismissing the complaint, on the grounds that the complaint fails to state a cause of action and that the action is barred by the First Amendment of the United States Constitution and section 8 of article I of the New York Constitution.
Plaintiffs are three women, each of whom is also a plaintiff in a personal injury action arising out of an automobile accident. Their actions are now pending in the Supreme Courts of Kings, Nassau and Queens Counties, and it is alleged that each of the actions is to be tried before a jury.
In the instant action, the plaintiffs are seeking to enjoin the publication of two advertisements, entitled "Too Bad Judges Can’t Read This To A Jury” and "And Now, The Big Winners in Today’s Lawsuits”, submitted for publication by defendant Aetna Life and Casualty Co. and published by defendants NYM Corp. and Newsweek, Inc., in the magazines New York and Newsweek respectively.
The thrust of these advertisements is that the damages awarded in personal injury actions are assuming astronomical proportions, often unrelated to the actual extent of the injury incurred. More specifically, these advertisements include such contested language as:
"Every payer of liability insurance premiums is a loser.”
"The jury is cautioned * * * to bear in mind that money doesn’t grow on trees. It must be paid through insurance premiums from uninvolved parties such as yourselves.”
"We can ask juries to take into account a victim’s own responsibility for his losses.”
"Insurers, lawyers, judges — each of us shares blame for this
*549 mess. But it is you, the public, who can best begin to clean it up.”
The defendants contend that as the intent of the advertisements is merely to advocate tort law reform, the "speech” at issue is "political expression” and fully protected by the First Amendment. Defendants NYM Corp. and Newsweek, Inc., add that since a newspaper is merely a passive receptacle for advertising, as to them a prior restraint is that much more difficult to sustain.
Plaintiffs allege that the language in question constitutes both jury tampering, violative of secion 215.25 of the Penal Law and misleading advertising, violative of section 350-a of the General Business Law and that, as such, the expression is beyond the protection of the First Amendment. In addition, the plaintiffs argue that the continued publication of these advertisements constitutes a "clear and present danger” to their ability to obtain an impartial jury and that no adequate remedy exists at law.
The question presented then is whether the language of the advertisements is protected by the constitutional guarantees of the First Amendment, thus barring the plaintiffs’ cause of action.
Throughout the long line of First Amendment cases, the Supreme Court has premised its holdings on the general proposition that free speech and a free press are fundamental to the American democratic system in that, by keeping the public informed, they guard against governmental abuses. Thus, in New York Times Co. v Sullivan (376 US 254, 269, 270), it held that: "[t]he general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. * * * we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open” (emphasis supplied).
In accordance with this "profound commitment” to open debate, the court has been reluctant to impose a limitation on what the press may publish, particularly where the limitation sought is in the form of a prior restraint. Such prior restraints have been said to come before the court with a "heavy presumption” against their constitutional validity. (Organization for a Better Austin v Keefe, 402 US 415; Nebraska Press Assn. v Stuart, 427 US 539.)
*550 While there is a "heavy presumption” of constitutionality in support of defendants’ conduct, and particularly defendant members of the press, the Supreme Court in its free speech and press cases has never gone so far as to hold injunctive relief absolutely impermissible. On the contrary, there are certain areas wherein it has been held permissible to regulate the content of speech, such as cases involving obscenity or the advocating of the overthrow of the government. (See, e.g., Southeastern Promotions v Conrad, 420 US 546; Dennis v United States, 341 US 494.) Similarly, statutes which reasonably regulate the time, manner and place of speech have been upheld. As was pointed out in the article "Supreme Court and the Right of Free Speech and Press” (Ann 11 L ed 2d 1116, 1120-1121): "legitimate attempts to protect the public * * * from present excesses of direct, active conduct, are not presumptively bad because they interfere with and, in some of its manifestations, restrain the exercise of First Amendment rights”.
It cannot, therefore, be held that it is prima facie unconstitutional for this court to regulate or restrain expression, particularly as the dividing line between speech which is protected and that which is not is far from clear-cut. This court must consider that while free press cases arguably protect defendants NYM Corp. and Newsweek, Inc., in the exercise of their editorial discretion as to what advertisements to print, these same cases do not necessarily afford the same extent and degree of protection to defendant Aetna as a mere advertiser. The contested expression, by reason of its very content, may not in fact be protected by the First Amendment, or the free press cases which interpret and apply this right.
In many of its decisions, when faced with First Amendment arguments, the Supreme Court employed a balancing mechanism, weighing the protections afforded by the First Amendment against the other constitutional rights, in an effort to maximize freedom of speech and press without detriment to other valid guarantees. (See, e.g., Wood v Georgia, 370 US 375.) More specifically, in a case such as this, where there is an alleged abridgement of the right to an impartial jury, such a balancing of rights and weighing of surrounding circumstances becomes imperative. Thus, it may be that the language, despite its protection, has so far imposed on the plain *551 tiffs’ right to an impartial jury as to warrant the restriction of said language.
A. COMMERCIAL SPEECH
In the early case of Valentine v Chrestensen (316 US 52), the Supreme Court held that expression for the primary purpose of commercial gain was beyond the ambit of the First Amendment. As cases arose subsequent to Valentine, however, it became increasingly difficult for the court to fashion a test which would effectively distinguish between commercial and noncommercial speech, so as to permit the latter the First Amendment protections which were denied to the former. The holding of Valentine became particularly difficult to apply in those cases where commercial speech had noncommercial aspects and vice versa.
Thus, in New York Times Co. v Sullivan (376 US 254, supra), the court held that political advertisements were within the First Amendment guarantees and did not lose their protection merely because they appeared in a commercial context. The court distinguished the advertisement in Sullivan from that in Valentine on the basis that it was not "commercial” but rather that (p 266) "[i]t communicated information, expressed opinion, recited grievances, protested claimed abuses and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern ” (Emphasis supplied.)
The effect of this holding was to narrow the gap between commercial and noncommercial speech, in terms of their treatment under the First Amendment, by indicating that the speech must tout a "private” rather than "public” interest before it can be found to lose its protected status. Despite this narrowing, however, it was held in Rowan v United States Post Off. Dept. (300 F Supp 1036, affd 397 US 728), that commercial advertising may be reasonably regulated without offending the First Amendment.
Thereafter, an injunction was sustained on the basis that commercial expression could be legitimately regulated by the State. (Pittsburgh Press Co. v Human Relations Comm., 413 US 376.) In that case, the court suggested that any protection arguably offered the advertisements under the Sullivan holding was vitiated by the fact that the commercial activity was illegal and "the restriction on advertising incidental to a valid limitation on economic activity.” (Pittsburgh Press Co. v Human Relations Comm., supra, p 389.)
*552 Ultimately the distinction between the two forms of expression became untenable and by its most recent cases the court has indicated that commercial speech is in fact protected.
In Virginia Pharmacy Bd. v Virginia Consumer Council (425 US 748) the court struck down a State statute which made it illegal for pharmacists to advertise. In stating that society has as strong an interest in the free flow of commercial information as they do in political information (Virginia Pharmacy Bd. v Virginia Consumer Council, supra, p 764) the court clearly eliminated whatever inconsistencies may have remained from their earlier holdings. The court distinguished the Pittsburgh case by stating that it had been decided in fact on discrimination and not on commercial speech grounds. In the final analysis the rationale followed the traditional lines of the court’s First Amendment philosophy, i.e., that free speech is essential to an informed public and fundamental to the American system. "[In] a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions * * * be intelligent and well informed. To this end, the free flow of commercial information is indispensable.” (Virginia Pharmacy v Virginia Consumer Council, supra, p 765.)
The defendants in the instant case relying on this line of cases argue that, whether or not the speech is commercial, it is fully protected, and the action to enjoin it is necessarily unconstitutional. On its face, this aspect of the defendants’ argument is valid. But underlying the general concept that commercial speech is protected is the qualification that such speech be truthful and the implication that the State retains the power to reasonably regulate commercial expression.
Thus, in the same case which established that First Amendment protection includes advertising, the court went on to state that by holding "that commercial speech, like other varieties, is protected, we of course do not hold that it can never be regulated in any way.” (Virginia Pharmacy Bd. v Virginia Consumer Council, supra, p 770.) In the same vein, the court provided (pp 771-772) that: "[ojbviously, much commercial speech is not provably false * * * but only deceptive or misleading. We foresee no obstacle to a State’s dealing effectively with this problem. The First Amendment * * * does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely.”
*553 The court again enunciated the principle that the State may intervene to protect the public from harmful commercial speech in Ohralik v Ohio State Bar Assn. (436 US 447, 462) by stating that: "the State has a legitimate and indeed 'compelling’ interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct.’ * * * We agree that protection of the public from these aspects of solicitation is a legitimate and important state interest.” Certainly the State’s interest in curbing unfair and abusive advertising becomes that much more "compelling” when such advertising imposes on the impartiality of the judicial process.
In Linmark Assoc. v Willingboro (431 US 85), the court reaffirmed the position taken in Virginia Pharmacy, that commercial expression is protected only so long as it is truthful. Although in that case the court held an ordinance which prohibited neighborhood "For Sale” signs to be unconstitutional, the court indicated (p 98) that: "[l]aws dealing with false or misleading signs, and laws requiring such signs to appear in such a form * * * as [is] necessary to prevent [their] being deceptive,’ * * * therefore, would raise very different constitutional questions. We leave those questions for another day, and simply hold that the ordinance under review here, which impairs 'the flow of truthful and legitimate commercial information’ is constitutionally infirm.” (Emphasis supplied.)
Even more recently, the Supreme Court re-emphasized that by their holding in Virginia Pharmacy they did not establish that commercial speech and noncommercial speech are indistinguishable. "To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution * * * of the force of the Amendment’s guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.” (Ohralik v Ohio State Bar Assn., 436 US 447, 456, supra; emphasis supplied.)
From this line of reasoning, it is clear that while commercial speech is "protected” under the First Amendment from prior restraint, the protection afforded is less than that pro *554 vided for noncommercial speech, so that when commercial expression is false or misleading it is afforded no protection whatsoever.
This same philosophy is evident in New York’s public policy, as exemplified by its statutes which prohibit false advertising, defining it as that: "which is misleading in a material respect; and in determining whether any advertising is misleading, there shall be taken into account * * * the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity to which the advertising relates”. (General Business Law, § 350-a; emphasis supplied.)
To the extent that the advertisements in question imply that personal injury awards are often excessive and unwarranted by the facts, but fail to indicate that such awards may be reduced or set aside if, in fact, excessive or unwarranted, these advertisements are misleading. As the court said in People v Volkswagen of Amer. (47 AD2d 868): "The test is not whether the average man would be deceived. Sections 349 and 350 of the General Business Law were enacted to safeguard the 'vast multitude which includes the ignorant, the unthinking and the credulous’ ”. By omitting any reference in the advertisements to the aforesaid mitigating factors, and by including such language as "every payer of liability insurance premiums is a loser” and "the jury is cautioned to bear in mind that money doesn’t grow on trees”, Aetna has effectively formulated an advertisement which may convince the "ignorant, unthinking and credulous” to arbitrarily reduce personal injury awards. As these advertisements, by directing their appeal to prospective jurors, directly contravene plaintiffs’ rights to an impartial jury, and as the continued publication of misleading advertising directly contravenes State policy against same, the advertisements herein may be constitutionally restrained. As was suggested in the Virginia Pharmacy case, commercial speech is "hardier” than noncommercial, and, therefore, less likely to be "chilled” by regulation. "Attributes such as these, the greater objectivity and hardiness of commercial speech * * * may also make inapplicable the prohibition against prior restraints.” (Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748, 772, n 24, supra; emphasis supplied.)
The court is aware that section 350-a of the General Business Law is enforceable only by the Attorney-General and, *555 therefore, may not provide a basis for plaintiffs’ cause of action. (Schutzman & Schutzman v News Syndicate Co., 60 Misc 2d 827.) However, to the extent that this section establishes the public policy against misleading advertising, it provides the proper analogy for this cause of action.
It must be pointed out that, in the context of commercial speech, a different standard is applied to the news media than to the advertiser. The news media, for the most part, is merely the conduit for the speech of the advertiser and, therefore, will not be held liable for the publication of advertising which is false or misleading, unless actual malice is shown (Goldstein v Garlick, 65 Misc 2d 538). The Supreme Court has consistently protected the right of the media to exercise its editorial discretion, particularly in the commercial setting (Bigelow v Virginia, 421 US 809; Miami Herald Pub. Co. v Tornillo, 418 US 241; New York Times Co. v Sullivan, 376 US 254, supra). It follows that while the speech is not protected, the right to publish the speech is protected. Thus while an injunction will constitutionally lie against defendant Aetna, it will not so lie against defendants NYM Corporation and Newsweek, Inc.
B. FAIR TRIAL
Throughout its history the Supreme Court has heard numerous cases involving a conflict between free speech and fair trial. In each of such cases, the court employed a "balancing” approach to assure that neither of these fundamental rights encroached too far upon the other. "The right of free speech, strong though it may be, is not absolute; when the right to speak conflicts with the right to an impartial judicial proceeding, an accommodation must be made to preserve the essence of both.” (Wood v Georgia, 370 US 375, 396, supra.)
Even if the contested expression were found to be protected, it may nevertheless be restricted in order to preserve plaintiffs’ right to an impartial jury.
In accordance with its traditional belief in the fundamental nature of the First Amendment, the court has often indicated in its holdings that the threat posed by the printed matter must be imminent before interference with such rights could be permissible. Thus, in the early cases of Bridges v California (314 US 252) and Pennekamp v Florida (328 US 331), the court came to formulate the "clear and present danger” standard as it would be applied to the reporting of, or commenting on, judicial proceedings. "[T]he substantive evil must *556 be extremely serious and the degree of imminence extremely high before utterances can be punished.” (Bridges v California, supra, p 263.)
This standard was relied on in the later case of Craig v Harney (331 US 367), where the court held that the Trial Judge had improperly held the newspaper publisher in contempt. Although the court in Craig did indicate that the news articles were "by any standard” unfair, it nevertheless found that the clear and present danger test had not been met, stating that the utterances "must constitute an imminent, not merely a likely, threat to the administration of justice.” (Craig v Harney, supra, p 376.) A similar result was reached in Wood v Georgia (370 US 375, 398, supra), where the court held that absent any showing of actual interference with the Grand Jury, the record lacked sufficient illustration of serious harm necessary to warrant holding the Sheriff in contempt.
The doctrine enunciated by these cases, by imposing stringent conditions on the issuance of any form of restraint, made the issuance of prior restraints that much more difficult to sustain. Thus the court came to state in Nebraska Press Assn. v Stuart (427 US 539, 559, supra) that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights” causing any prior restraint to come before the court "with a heavy presumption against its constitutional validity.”
However, as the advertisements at issue do not direct their attention solely to the general public for informational purposes only, what is really at issue here is more than pretrial publicity or trial reporting. Despite the defendants’ claims that they are merely advocating tort law reform, there is the inescapable implication that the advertisements are geared toward influencing jurors and potential jurors in their decision-making process. As such, the advertisements violate the State public policy expressed in section 215.25 of the Penal Law, which states that a person shall be guilty of tampering with a juror: "when, with intent to influence the outcome of an action or proceeding, he communicates with the juror in such action or proceeding, except as authorized by law.” For that reason alone, the speech might properly be restrained as it has been held that the press is not immune from statutes of general applicability. (See, e.g., Dennis v United States, 341 US 494, 508, supra; Branzberg v Hayes, 408 US 665, 691-692.) More to the point is the reasoning stated in *557 New York State Broadcasters Assn. v United States (414 F2d 990, 997): "The real point here is that we are not primarily in the realm of ideas at all but are chiefly concerned with speech closely allied with the putting into effect of prohibited conduct.”
The defendants contend that the plaintiffs lack standing to enforce a penal statute. However, as with the General Business Law section, the plaintiffs here are not seeking to enforce a statute, but rather raise the statute as illustrative of the fact that the language in question is not of the type that is fully protected by the First Amendment.
Moreover, case law indicates that while there is a balancing between free speech and fair trial, where, as here, there is a direct assault upon the jurors, the balance weighs more heavily on the side of fair trial. In Matter of Gannett Co. v De Pasquale (43 NY2d 370) the Court of Appeals sustained an exclusion order which closed a pretrial hearing to the press. The court balanced the respective guarantees and found that the public’s interest in open trials could be satisfied without the press being present at every stage of the action. "To be sure, when a restraint is imposed * * * tensions between First and Sixth Amendment rights are greatest * * * This, of course, does not mean that trial courts are left powerless to stem improper revelation of facts that would present an imminent threat to the impaneling of a constitutionally impartial jury.” (Matter of Gannett Co. v De Pasquale, supra, pp 379-380.) The defendants argue that Gannett is distinguishable in that it permitted only the keeping of certain information from the public rather than the suppressing of information already in the public record. While it is true that the specific facts of Gannett are different from those in the case at hand, the rationale of Gannett is very much applicable to the instant action; that is, information which threatens the impaneling of an impartial jury may be restrained despite the First Amendment.
Moreover, these advertisements not only affect the jurors before they are impaneled, thereby threatening the impaneling process but they also affect the very nature of the entire judicial proceeding by supplying evidence which might otherwise be inadmissible at trial and which the plaintiffs have no opportunity to refute. Such situations have led the Supreme Court to hold on the side of the Sixth Amendment in the balancing process.
*558 Indicative of many cases is that of Sheppard v Maxwell (384 US 333, 351) wherein the court stated that due process requires "that the jury’s verdict be based on evidence received in open court, not from outside sources.” (See, also, Irvin v Dowd, 366 US 717, 722.) In Sheppard, the court favorably cited Marshall v United States (360 US 310) wherein a verdict was set aside because the jurors got information from the news which was not admitted at trial. Quoting from Marshall, the court indicated (p 351) that: "we did not consider dispositive the statement of each juror 'that he would not be influenced by the news articles, that he could decide the case only on the evidence of record’ ”.
Defendants’ suggestion that the advertisements have no adverse effect on jurors or the jury selection process has no merit. Defendants alternatively suggest that whatever bias may result from the advertisements is too remote to threaten plaintiffs’ trial or that such bias may be cured by voir dire. This suggestion, too, has no merit.
"Every procedure which would offer a possible temptation to the average man * * * to forget the burden of proof * * * or which might lead him not to hold the balance nice, clear and true * * * denies the latter due process of law.” (Tumey v Ohio, 273 US 510, 532; emphasis supplied.)
" '[O]ur system of law has always endeavored to prevent even the probability of unfairness’ * * * In addition experience teaches us that there are numerous situations in which [publicity] might cause actual unfairness — some so subtle as to defy detection by the accused or control by the judge.” (Estes v Texas, 381 US 532, 543, 544-545; emphasis in the original.)
It can thus be seen that while the court is reluctant to restrain the general reporting practices of the press, either pretrial or during trial, when such reporting goes directly to and bears directly upon the jurors, that reluctance is overcome by the necessity of affording the Sixth Amendment guarantees.
Furthermore, it must be realized that any restraining order issued against Aetna would constitute merely an indirect restraint vis-á-vis NYM Corporation and Newsweek, Inc. As such, the reliance placed by the defendants on cases involving the restraint of the news media proper is inapposite.
Accordingly, as the advertisements violate the State public policy against jury tampering, unduly burden plaintiffs’ right to an impartial jury, distort the trial process by provid *559 ing otherwise inadmissible insurance evidence, and do not represent the speech of the news media, an injunction restraining these advertisements may constitutionally lie as against defendant Aetna. However, an injunction may not so lie against NYM Corporation and Newsweek, Inc., since, as to them, the more stringent clear and present danger standard, necessary for a direct prior restraint of the press, has not been satisfied.
C. INJUNCTIVE RELIEF
Even if an injunction may constitutionally be granted, the motion must nevertheless be denied unless the plaintiffs demonstrate that they are entitled to such relief. They must satisfactorily establish a likelihood of success on the merits, that irreparable injury will result absent injunctive relief, and a balancing of equities in their favor (Shelborne Beach Club v Hellman, 49 AD2d 933). After a weighing of all of these factors, the court must find that the plaintiffs have established a clear right to relief (Dyson v Chambers & Sons, 60 AD2d 707; Ultra Fuel Corp. v Johnston, 30 AD2d 801; Metz v People, 73 Misc 2d 219).
This court accepts the argument that these advertisements violate plaintiffs’ right to an impartial jury and does not agree with defendants’ contention that the injury is remote or curable by voir dire. "In most instances, the trial judge will be able to deal effectively with potential prejudice * * * by cautioning jurors * * * and by carefully instructing them to disregard any prejudicial material, which might come to their attention * * * However, there may well be extreme situations * * * in which such procedures may be inadequate and ineffectual to assure a fair trial.” (Matter of Oliver v Postel, 30 NY2d 171, 182.) Nevertheless, as entitlement to preliminary relief depends in the first instance upon a showing of a clear right to same even with a showing of possible injury, if such clear right is not established, the motion must be denied. "Absent such a showing, regardless of a demonstration of possible irreparable injury it was error for Special Term to grant plaintiff’s application for a temporary injunction”. (Demisay v Whalen, 59 AD2d 444, 447.)
In light of the foregoing, the court finds that the plaintiffs have not sustained their burden of proof and accordingly the motion for preliminary injunction is denied. Moreover, due to the stringent conditions which must be satisfied when seeking to restrain the freedom of the press, and due to the failure of *560 the plaintiffs to overcome the constitutional barriers vis-á-vis the defendant publishers, the cause of action is dismissed as to NYM Corporation and Newsweek, Inc.
However, as there is a basis for finding that the language of the advertisements is not constitutionally protected and that the language impedes plaintiffs’ ability to impanel a constitutionally guaranteed impartial jury, we find that plaintiffs have established a cause of action as against the defendant Aetna. Accordingly, said defendants’ cross motion is denied. In view of the seriousness of the allegations and the gravity of the rights involved on both sides, this matter is set for trial on September 11, 1978 subject to compliance with the applicable calendar rules, and subject to the Justice then presiding in Trial Term, Part I.