OPINION OF THE COURT
Kristin Booth Glen, J.
This case presents important questions concerning the scope of sections 349 and 350 of the General Business Law (prohibiting deceptive practices and false advertising), standing to sue for violation of those statutes, and the applicability of First Amendment protection to an insurance industry advertising campaign which purports to tie rising insurance costs to "the Lawsuit Crisis.” These issues arise on a motion to dismiss the complaint brought by defendant Insurance Information Institute (I.I.I.) pursuant to CPLR 3211 (a) (7).
PARTIES AND BACKGROUND
Defendant describes itself as a "non-profit educational and *922 communications organization dedicated to improving public understanding of the property and casualty insurance business and to providing information * * * about issues of relevance to the insurance business. I.I.I. is supported by more than 300 insurance companies and has been in existence for over twenty-five years.” Plaintiffs consist of New York Public Interest Research Group, Inc. (NYPIRG), and three individuals. As alleged in their amended complaint, NYPIRG "is a not-for-profit membership corporation * * * [whose members] include approximately 30,000 citizens in communities throughout New York State besides 150,000 student members * * *. NYPIRG, in furtherance of its broad concern for the public welfare, among other things, investigates and, as appropriate, addresses problems of common concern before the judicial, legislative and executive branches of our State Government. In particular, NYPIRG conducts research and makes recommendations concerning the interests of the public and of the members of NYPIRG in insurance-related issues and in the proposed changes in the civil justice system advocated by the insurance industry.” The individual plaintiffs are all plaintiffs in other, personal injury, lawsuits.[1]
In their complaint, plaintiffs plead three causes of action relating to I.I.I.’s multimedia advertising campaign, which I.I.I. refers to as the "Lawsuit Crisis”. The magazine and newspaper ads, and the television spots all assert that the quality of every American’s life is threatened by the existence of a "Lawsuit Crisis”; that is, that huge numbers of people suing doctors, pharmaceutical companies, municipalities, etc., for personal injuries due to malpractice, negligence, etc., that these personal injury plaintiffs are receiving huge jury awards, that, because of these awards, which are paid, in the final analysis by insurance companies, the insurance companies must raise their premiums for liability insurance, or deny coverage. This "crisis,” in turn, according to the ads, causes, among other things, obstetricians to cease delivering babies, pharmaceutical companies to discontinue manufacturing life *923 saving drugs (e.g., polio vaccine), and municipalities to close down playgrounds, firehouses, afterschool programs, etc.
Plaintiffs allege that the statements made in defendant’s advertisements distort the truth, and conceal material facts. Their three causes of action plead that I.I.I.’s “Lawsuit Crisis” advertising campaign
(1) constitutes a deceptive act or practice within the meaning of section 349 of New York’s General Business Law;
(2) constitutes false advertising within the meaning of General Business Law § 350; and,
(3) by knowingly violating these statutes, seeks to corrupt the legal system by prejudicing prospective jurors against injured victims, thus preventing injured plaintiffs from "obtaining impartial justice.”
Plaintiffs specifically allege that they have been injured by defendant’s "Lawsuit Crisis” advertising campaign because the ads "have deceived the public, including but not limited to members of NYPIRG * * * [and] have injured NYPIRG [1] by impeding, impairing and defeating NYPIRG’s efforts [to educate and advise the public] by forcing NYPIRG to exp[e]nd additional time and money to counteract defendant’s deception; and [2] by damaging NYPIRG’s recruitment of new members.” With regard to the individual plaintiffs, the amended complaint alleges that defendant’s advertisements "have deceived the jury pool, with the result that the eventual jur[ies in the individual plaintiffs’ respective personal injury actions] will compensate [their injuries] inadequately or not at all.” Plaintiffs seek injunctive relief and money damages for each statutory violation.
I.I.I. predicates its motion to dismiss[2] on three grounds: (1) the statutes do not apply to lobbying efforts such as defendant’s; (2) plaintiffs lack standing under the statutes; and (3) the "Lawsuit Crisis” advertising campaign constitutes noncommercial, protected speech under the First Amendment.
THE STATUTES
Defendant relies upon Genesco Entertainment v Koch (593 F Supp 743, 752 [SD NY 1984]) for the proposition that sections 349 and 350 should be construed narrowly to apply only to *924 "an ordinary or recurring consumer transaction.” Defendant’s reliance is misplaced. Genesco concerned a dispute over the renting of Shea Stadium by Genesco for a country and western music concert. The District Court Judge found that the concert was a " 'single shot transaction’ * * * not of a recurring nature [and] without ramifications for the public at large”. (Supra, at 752.) This is clearly distinguishable from the case at bar: I.I.I.’s advertisements were broadcast and published numerous times and were focused on the "public at large.” Moreover, the Genesco court acknowledged that it was construing the statutes without any guidance from New York State courts. Not only is Genesco distinguishable on its facts, the statutes themselves clearly require a different result in this case.
Section 349 (a) of the General Business Law provides: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.”
Section 350 of the General Business Law provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.” "False advertising” is defined as "[Advertising, including labeling, which is misleading in a material respect; and in determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.” (General Business Law § 350 [a]; emphasis supplied.)
Until the enactment of section 350-d of the General Business Law, in 1984, only the New York State Attorney-General had the right to bring suit for the violation of section 350. General Business Law § 350-d confers a cause of action under section 350 upon individuals who are injured by false advertising. In amending the act to provide private rights of action, the Legislature created new substantive rights by providing relief for conduct which was not unlawful under the common law or statute. (See, Freschi v Grand Coal Venture, SD NY, May 28, 1982 [No. 81 Cir 4331 (RSW)], slip opn, at 5 ["By eliminating the element of intent, enabling prospective enjoin *925 ment, creating a private right of action for individual consumers and allowing the court to award treble damages in cases of willful violations, § 349 substantively redefines the meaning of consumer fraud actions, alters the proof required to make out a successful claim, and thereby creates liabilities, penalties and forfeitures that 'would not exist but for (the) statute’ ”]; Ludmer v Franklin Career Search Intl., NYLJ, Dec. 8, 1981, at 12, col 6 [Sup Ct, Kings County, Nov. 19, 1981]; Geismar v Abraham & Strauss, 109 Misc 2d 495, 498-499 [Dist Ct, Suffolk County 1981].)
I.I.L’s main argument against the applicability of the General Business Law to the instant media campaign is that these statutes have never before been applied to a situation like the one presented here. While that may be true, that fact alone does not prevent article 22-A of the General Business Law from applying here. General rules of statutory construction and the particular legislative history[3] of these statutes support and indeed require an expansive reading which would clearly encompass the instant case.
Both General Business Law §§ 350 and 349 qualify as remedial statutes: they "give[e] a mode of remedy for a wrong where an injured person had none or an ineffective remedy under the prior system of law.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 35; see also, McKinney’s Cons Laws of NY, Book 1, Statutes §§ 321, 342.) Remedial statutes such as these require liberal construction and application, "to spread their beneficial results as widely as possible”. (McKinney’s Cons Laws of NY, Book 1, Statutes § 54 [a].) In addition, the court must "consider the mischief sought to be remedied and should favor the construction which will suppress the evil and advance the remedy”. (Matter of Metropolitan Life Ins. Co. v *926 State Tax Commn., 80 AD2d 675, 677 [3d Dept], affd 55 NY2d 758 [1981]; McKinney’s Cons Laws of NY, Book 1, Statutes §§ 54, 95.)
The Legislature specifically chose to word these statutes broadly. "As stated by the Act’s drafting committee, the Act was designed to include 'all economic activity’ within the ambit of its statutory phrase 'business, trade or commerce or the furnishing of any service.’ ” (Note, New York Creates a Private Right of Action to Combat Consumer Fraud; Caveat Venditor, 48 Brooklyn L Rev 509, 543 [1982].) Thus, the Act was envisioned "as a mechanism to protect the public from 'all’ deceptive acts and practices.” (Caveat Venditor, op. cit., at 544; see, Beslity v Manhattan Honda, 120 Misc 2d 848 [1st Dept 1983]; Governor’s mem on approval of L 1970, ch 43, 1970 NY Legis Ann, at 472; mem of Attorney-General, 1970 NY Legis Ann, at 92.)
Section 349 applies to "[deceptive acts or practices in the conduct of any business”. (General Business Law § 349 [a]; emphasis added.) By its own definition, defendant’s "business” is "to provid[e] information * * * about * * * the insurance business.” Any action by defendant in disseminating information about the insurance business that is deceptive would thus violate section 349. (See, Sulner v General Acc. Fire & Life Assur. Corp., 122 Misc 2d 597, 599-601 [Sup Ct, NY County 1984] [Baer, J.].) General Business Law § 349 thus applies to defendant’s advertisements.
There is no dispute that the communications at issue here constitute "advertising” within the meaning of General Business Law § 350. If defendant’s advertising "is misleading in a material respect * * * [or] fails to reveal facts material” to the subject matter of the advertisements (General Business Law § 350-a), then it violates General Business Law § 350.
In considering a motion to dismiss based on pleadings alone, the court must presume that the allegations of the complaint are true. (See, O’Henry’s Film Works v Nabisco, Inc., 112 AD2d 825 [1st Dept 1985].)
Plaintiffs allegations, if true, include that defendant is the mouthpiece of the insurance industry, that defendant is deliberately deceiving the public, through its advertising campaign, about the nature and cause of the current "insurance crisis” (that is, the high cost and unavailability of liability insurance); that the purported "Lawsuit Crisis” is a "myth manufactured by the insurance industry” to "prejudice * * * juries *927 and judges, subvert our judicial system and * * * undermine the right to a jury trial.”
Plaintiffs contend that the entire "Lawsuit Crisis” campaign is predicated on a falsehood. While defendant’s ads convey the distinct impression that the American judicial system is choked with personal injury litigation, plaintiffs observe that, according to the National Center for State Courts, while total civil filings did actually increase from 1978 to 1981, the total actually decreased from 1981 to 1984. In addition, plaintiffs argue, defendant’s advertisements are aimed at the average person who lacks sophisticated legal knowledge, and defendant exploits this ignorance by carefully concealing the distinction between claims filed and actual damage awards. If plaintiffs’ claims are true, defendant’s ads are "misleading in a material respect”, and violate General Business Law § 350. (General Business Law § 350-a.)
In addition to the defendant’s alleged deception of the general public about the existence of a "Lawsuit Crisis”, plaintiffs discuss various individual advertisements and all of which, they argue, contain numerous misleading statements and false impressions. One of I.I.I.’s advertisements claims that obstetricians, driven by fear of malpractice claims, have stopped delivering babies; that, as a result, women have difficulty finding a doctor. Plaintiffs report that, in fact, according to the Statistical Abstract of the United States, the number of obstetricians/gynecologists in the United States increased by more than 50% from 1970 to 1982.
Another advertisement conveys the frightening idea that some members of the clergy have stopped counseling their parishioners because they are afraid of lawsuits. Petitioners contend, and defendant does not dispute that, in fact, no member of the clergy has ever been held liable for clerical malpractice.
Another of defendant’s advertisements states that "Only one [company] still makes the vaccine for polio * * *. It’s a symptom of the lawsuit crisis.” This ad conveys the idea that there had once been many manufacturers of polio vaccine, that all but one have since withdrawn from the market because of huge jury awards, and that there currently is, or will presently be, a shortage of polio vaccine. According to plaintiffs, defendant carefully omits the information that while only one company was making polio vaccine in 1974, there are now two, and a third, moreover, is actively seeking *928 to enter the market and has a license application pending. If true, this would constitute an omission of facts material to the subject of the advertisement.
If these and plaintiffs’ other allegations are deemed true, which they must be for the purposes of the instant motion, plaintiffs’ complaint states a cause of action under General Business Law §§ 349 and 350 and is legally sufficient in this respect. (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]; General Business Law §§ 349, 350, 350-a.)
STANDING
In addition, I.I.I. moves to dismiss the complaint on the ground that plaintiffs lack standing. This branch of its motion must also be denied.
Section 349 (h) of the General Business Law provides, in pertinent part: "In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.”
Section 350-d (3) of the General Business Law, as well, provides, in pertinent part: "Any person who has been injured by reason of any violation of section three hundred fifty or three hundred fifty-a of this article may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.”
Defendant argues that plaintiffs do not constitute a "person who has been injured” within the meaning of these statutes. The Court of Appeals has held, however, that when "legislation proscribes conduct against a class,” a "bona fide and nationally recognized organization” may represent the class of persons who can " '[claim] to be aggrieved’ ” under that legislation. (National Org. for Women v State Div. of Human Rights, 34 NY2d 416, 419-420 [1974].) NYPIRG qualifies as a bona fide organization dedicated to serving the interests of general public welfare as it is a not-for-profit, tax-exempt organization with tens of thousands of members. Article 22-A of the General Business Law, moreover, exists to protect the general public (which includes members of NYPIRG) from deceptive acts or practices.
In addition, the individual plaintiffs arguably fall "within *929 the zone of interest to be protected by the statute”, and can be found to have standing to sue.[4] (Matter of Fritz v Huntington Hosp., 39 NY2d 339, 346 [1976]; see also, Matter of District Attorney of Suffolk County, 58 NY2d 436, 442 [1983] ["the contemporary rule is that a party has standing to enforce a statutory right if its abuse will cause him injury and it may fall within the 'zone of interest’ protected by the legislation”].)
Accordingly, plaintiffs have standing to maintain this action.
FIRST AMENDMENT ISSUES
The most critical issue raised by defendant is whether enforcement of the statutes would impermissibly burden I.I.I.’s speech and violate the First Amendment. The threshold determination is whether I.I.I.’s advertisements constitute commercial or noncommercial speech. Commercial speech which is false or misleading can be regulated and restricted (e.g., Central Hudson Gas & Elec. v Public Serv. Commn., 447 US 557, 563 [1980]), while the government is powerless to regulate noncommercial speech based on its truth or falsity.
Where noncommercial speech is involved, our long-standing First Amendment jurisprudence provides that its content may not be suppressed because the speaker is biased or her/his conclusions erroneous or inaccurate, since "the people in our democracy are entrusted with the responsibility of judging and evaluating the relative merits of conflicting arguments” (First Natl. Bank of Boston v Bellotti, 435 US 765, 791 [1978]). The lesser protection for "commercial” speech is the result of more than a decade of Supreme Court jurisprudence which has simultaneously brought commercial speech within the ambit of the First Amendment and defined and described the levels of protection such speech should be accorded.

Protection of Commercial Speech.

Prior to its decision in Virginia Pharmacy Bd. v Virginia Consumer Counsel (425 US 748 [1976]) the court had held that commercial speech was exempt from the protection of the First Amendment based on the commercial motivation of the speech rather than its content (e.g., Valentine v Chrestensen, 316 US 52, 54 [1942] [purely commercial advertising is merely *930 the pursuit of "gainful occupation”]). This focus on the profit motive as rendering commercial speech unworthy of protection began to be replaced with an increasing scrutiny of content (e.g., New York Times Co. v Sullivan, 376 US 254 [1964]; Pittsburgh Press Co. v Human Relations Commn., 413 US 376 [1973]).[5] The final reversal came in Virginia Pharmacy where the court held that purely commercial speech, when truthful, is entitled to First Amendment protection because of its value to individual consumers and the general public. It was thus not the motivation of the speaker or, as the court later held in First Natl. Bank (supra), the identity of the speaker, but the fact that the information conveyed, although doing no more than " 'proposing] a commercial transaction’ ” added to the sum total of ideas and information employed by the citizenry in making economic, as well as political choices. (Virginia Pharmacy Bd. v Virginia Consumer Counsel, supra, at 762.)
The underlying bases of the speaker/content distinction are fully debated in the several opinions which constitute the decision in First Natl. Bank (supra), holding that the State may not regulate speech simply because the speaker is a corporation. The differing and sometimes conflicting values which the First Amendment serves were also explicitly considered in that case. Three major purposes of the First Amendment’s guarantee of freedom of speech have been identified. These are:
1) furtherance of the individual’s ability of self-expression and thought (see, e.g., Whitney v California, 274 US 357, 375 [1927] [Brandeis and Holmes, JJ., concurring]);
2) furtherance of an open marketplace of ideas (see, e.g., Abrams v United States, 250 US 616, 630 [1919] [Holmes and Brandeis, JJ., dissenting]; Milton, Areopagitica, A Speech for the Liberty of Unlicensed Printing to the Parliament of England [1644]); and
3) furtherance of intelligent, self-government in a demo *931 cratic system (see, e.g., Meiklejohn, Political Freedom [1960]; Emerson, The System of Freedom of Expression, at 7 [1970]).
Obviously, as Justice White’s dissent pointed out, the first of these interests is not implicated where corporate (or commercial) speech is involved (supra, at 804-805). The majority opinion, written by Justice Powell, stressed the second, noting "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual” (supra, at 777).
The majority drew an analogy to the commercial speech cases, writing that "They illustrate that the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw. A commercial advertisement is constitutionally protected not so much because it pertains to the seller’s business as because it furthers the societal interest in the 'free flow of commercial information’ ” (supra, at 783).
This analysis also explains why nontruthful commercial speech is not protected — because it does not increase the amount of information which consumers may employ in making their economic decisions. Unlike political speech of questionable accuracy[6] commercial speech is protected precisely because it increases the truthful information available to consumers (see, Central Hudson Gas & Elec. v Public Serv. Commn., 447 US 557, 563 [1980], supra ["(t)he First Amendment’s concern for commercial speech is based on the informational function of advertising * * * (c)onsequently, there can be no constitutional objection to the suppression of * * * messages that do not accurately inform the public”]).
The court in Virginia Pharmacy (supra) expressly recognized that the First Amendment did not interfere with a "State’s dealing effectively” with the problem of "deceptive or misleading” commercial speech, even when it is "not provably false, or even wholly false”. (Supra, at 771.) The State may constitutionally insure "that the stream of commercial information flow[s] cleanly as well as freely” (supra, at 772).
*932 This position was restated and amplified in Bates v State Bar of Ariz. (433 US 350, 383 [1977], supra) where the court wrote: "Advertising that is false, deceptive, or misleading of course is subject to restraint * * *. Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech * * *. And any concern that strict requirements for truthfulness will undesirably inhibit spontaneity seems inapplicable because commercial speech generally is calculated. Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability. Thus, the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena.” (See also, Linmark Assocs. v Willingboro, 431 US 85, 97 [1977].)
This discussion of the reasons for the protection and regulation of commercial speech is necessary because of the lack of any "bright line” test in determining what is or is not commercial speech (e.g., Zauderer v Office of Disciplinary Counsel, 471 US 626, 637 [1985] ["More subject to doubt, perhaps, are the precise bounds of the category of expression that may be termed commercial speech”]). Such determination can finally be made only by reference to the underlying principles and analyses of the court’s commercial and corporate speech decisions.

Determination of whether Speech is Commercial.

Beside its notion of commonsense difference, the Supreme Court has generally looked at the primary purpose of the expression (see, e.g., Friedman v Rogers, 440 US 1, 11-13, and at 12, n 11 [1979]), finding it commercial if it predominantly invites a commercial transaction (e.g., Central Hudson Gas & Elec. v Public Serv. Commn., supra, at 561; Virginia Pharmacy Bd. v Virginia Consumer Counsel, supra, at 771, n 24). The fact that otherwise commercial speech includes information on an opinion concerning a matter of public concern or an ongoing debate does not remove its primary commercial character or entitle it to greater protection than it might otherwise have. (Central Hudson Gas & Elec., supra, at 563, n 5.)[7]
*933 In Bolger v Youngs Drug Prods. Corp. (463 US 60 [1983]) the court attempted to enumerate some of the characteristics to be considered in determining whether speech was commercial or noncommercial. At issue there were pamphlets on the use of contraception and the prevention of venereal disease which were circulated by the manufacturer of Trojan-brand condoms, who was identified on each of the pamphlets. The court held that
1) the mere fact that the pamphlets were conceded to be advertisements — that they were paid for by the advertiser— was insufficient to compel a conclusion that they were commercial speech;
2) the reference to specific products manufactured by the advertiser did not, in and of itself, render the pamphlets commercial speech;[8] and
3) an economic motivation for mailing the pamphlets was not sufficient to turn them into commercial speech.
The presence of all three factors, however, compelled the court’s conclusion that the pamphlets were commercial speech. (Supra, at 67-68.) Specific language in the pamphlets which informed potential consumers where condoms could be purchased and gave detailed descriptions of various Trojan-brand condoms persuaded the court that the company was not engaged in the type of "direct comment * * * on public issues” deserving of the "full panoply” of constitutional protections. (Supra, at 68.) The primary purpose of the pamphlets was to sell condoms to their recipients; the discussion of related issues of public interest was insufficient to change their character for purposes of First Amendment analysis.
*934 The dividing line is thus clear. If, within a commonsense reading, an advertisement is obviously intended to promote sales, it is commercial speech. If a public message or discussion is incorporated, it is still commercial speech. If, however, the advertisement is a direct comment on a public issue, unrelated to proposing any particular commercial transaction, it is protected. This analysis must now be applied to the advertisements at issue on this motion.
THE ADVERTISEMENTS
The materials dissemninated by I.I.I. consist of various print advertisements and television commercials which, according to I.I.I., seek to "focus public attention on problems created by our current civil litigation system and to initiate and advance discussion of tort reform * * *. Each advertisement asks the reader or viewer to become informed about the civil justice system and possibilities for its improvement.” Each advertisement conveys effectively that a "Lawsuit Crisis” exists, that the high cost or unavailability of liability insurance is due solely to an explosion of lawsuits, and that insurance companies have no responsibility for rising premiums or the unavailability of insurance. As described by defendant, "[e]ach advertisement offers the reader or viewer a free report, which describes reform proposals and provides the names and addresses of various involved organizations.” These are two examples of voice-over scripts for the television commercials:
"The future of high school sports is unclear.
"Today, schools are thinking about canceling football and other major sports.
"What are the reasons? Lawsuits are costing more and more. Insurance costs are rising. Some officials think it just isn’t worth it.
"What can be done? Call for this free report.
"Learn how to protect your rights.
"Learn how to stop paying the price.
"Our cities are in a bind.
"Money needed for fire fighters, police and other services is being used to pay the price of The Lawsuit Crisis.
"New York City says lawsuits may soon cost as much as the fire department.
"Some California cities face an estimated two hundred *935 million dollars in lawsuits. The money has to come from somewhere.
"Call for this free report.[9] Learn how to protect your rights and help fight The Lawsuit Crisis.
"Learn how you can stop paying the price.”
DISCUSSION
When analyzed for the factors set forth in Bolger (supra) and the justification for limiting the protection of commercial speech to truthful communication, it becomes clear that the advertisements at issue here are not primarily commercial speech within the meaning of existing case law. Most critically, the advertisements do not "propose a commercial transaction” since they are generally not directed to potential buyers of the advertiser’s product. The ads address issues of malpractice, product and municipal liability insurance which undoubtedly affect the prices readers ultimately pay for various services (medical care paid to health care providers, governmental services financed by taxes, etc.) but they do not, except incidentally,[10] reach the direct consumers of those insurance products.
The purpose of the advertisements is complex, but reflects at least three major aims. One is to influence the public, as potential voters, to encourage legislative action (such as the bills which have been pending in our Legislature relating to caps on judgments, etc.)[11] which will decrease payments made by the insurance companies. A second purpose may well be to encourage readers and viewers, as potential jurors, to decrease plaintiffs’ recoveries by awarding lower verdicts.[12] A third is to *936 generally improve the image of the insurance industry which is under criticism for many reasons unrelated to payments made as part of the litigation process.[13]
All of these purposes clearly inure to the economic benefit of the insurance industry, but as the earlier discussion demonstrates, it is not economic motivation, but commercial content which deprives potentially untruthful speech of full First Amendment protection.[14]
Because the primary purpose or purposes of the ads are not the proposal of a commercial transaction between the defendant (or its constituent insurance companies) and the viewers or readers of the ads, and because their primary purpose is to influence a variety of public debates (whether or not truthfully), I find that they are not commercial speech and are thus *937 subject to the full protection of the First Amendment.[15] Any regulation based on their alleged falsity[16] is thus constitutionally impermissible. Accordingly, defendant’s motion to dismiss is granted.

. Jeanne King, as administratrix of Anna Katz’s estate, is involved in a medical malpractice action against the hospital in whose emergency room Anna Katz died; James Carroll, as guardian ad litem for his son, has commenced a negligence action against the drunk driver who allegedly caused Kevin’s permanent, totally disabling injuries; and Denise Hostettler has brought an action charging medical malpractice and hospital negligence for the injuries sustained at birth by her son, who is blind, deaf, and totally helpless.

. Plaintiffs filed their original complaint on June 18, 1986, which I.I.I. answered on August 7, 1986. Plaintiffs filed their amended complaint on September 16,1986, to which I.I.I. responded by serving the instant motion.

. For the legislative history, see especially Note, New York Creates a Private Right of Action To Combat Consumer Fraud: Caveat Venditor (48 Brooklyn L Rev 509, 559 [1982] [Caveat Venditor], citing Report of the Committee on New York State AntiTrust Law of the AntiTrust Law Section of the New York State Bar Association: A Proposed New State Law Making Deceptive Acts or Practices Unlawful, 1968 NYSBA AntiTrust L Symposium 114, 129 [CCH ed]). Caveat Venditor contains a lengthy and detailed analysis of the Act, including all relevant legislative history and a comprehensive analysis of similar and identical statutes throughout the United States. The article points out that because the Act provides no internal guidance with respect to the meaning of its terms, and that few cases have been decided interpreting the Act, that interpretive guidance must be sought from the Act’s legislative history, New York Rules of Construction, and analogous statutes and the case law decided under them. (Caveat Venditor, op. cit., at 519-525.)

. If their allegations are deemed true, they either have settled or will settle for amounts less than their actions would otherwise be "worth”, or received or anticipate receiving jury verdicts below their cases’ "worth” as a result of defendants campaign.

. In Pittsburgh Press Co. v Human Relations Commn. (413 US 376), the court considered an ordinance which generally prohibited a newspaper from carrying help wanted ads in gender-designated columns. The court distinguished purely commercial advertisements merely "propos[ing] a commercial transaction” from advertisements expressing an editorial position on matters of social or political concern. (Supra, at 385.) In making this distinction, the court signaled its shift from the economic motivation of the speaker to the content of the speech. (Supra, at 386-387.)

. It is precisely in this political area, as Justice Powell wrote, that " 'the state has a special incentive to repress opposition and often wields a more effective power of suppression’ ” (First Natl. Bank of Boston v Bellotti, 435 US 765, 777, n 11, quoting Emerson, Toward a General Theory of the First Amendment, at 9, and citing Meiklejohn, Free Speech and Its Relation to Self-Government, at 24-26).

. The court there ruled on a Public Service Commission ban of advertising promoting the use of electricity, but considered whether a different result would occur if the promotional advertising included discussion of environmental concerns or other " 'questions frequently discussed and debated by our political leaders.’ ” (Central Hudson Gas & Elec, v Public *933 Serv. Commn., 447 US 557, 563, n 5.) It held that advertising which "links a product to a current public debate” does not thereby become entitled to constitutional protection afforded noncommercial speech. (Supra, at 563, n 5.) It wrote "[Advertisers] enjoy the full panoply of First Amendment protections for their direct comments on public issues. There is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions” (supra, at 563, n 5).

. To be categorized as commercial, speech does not have to refer to a specific brand or manufacturer; "a trade association may make statements about a product without reference to specific brand names”, and this can constitute commercial speech. (Bolger v Young Drug Prods. Corp., 463 US 60, 67, n 13, citing National Commn. on Egg Nutrition v Federal Trade Commn., 570 F2d 157 [7th Cir 1977], cert denied 439 US 821 [1978].) In the latter case the Seventh Circuit upheld regulation of commercials promoting the sale of eggs by attempting to defuse fear of health hazards due to their high concentration of cholesterol.

. The "free report” referred to is a slickly done, nine-page pamphlet with the name and logo of the Insurance Information Institute, "A nonprofit action and information center”, at the top of the cover. Page 1 contains a message from the president of I.I.I. which includes the following: "America’s insurance companies are deeply concerned about the lawsuit crisis. The high cost of lawsuits leads to higher insurance premiums, which leads to higher taxes, and disruptions to our daily lives and businesses.”

. Doctors, CEOs of drug manufacturers, and governmental officials may be among the readers and viewers, but they are presumably an extremely small percentage and the ads are obviously not directed to them in their "consumer” capacity.

. For a discussion of recent and pending legislation relating to malpractice rates, see, e.g., Kramer and Moore, Medical Malpractice—Comment on New Legislation, NJLJ, Aug. 1, 1988, at 3, col 1.

. Voir dire of jurors in civil cases now frequently includes questions directed to this advertising campaign, and a large number of potential jurors indicate both that they are aware of and influenced by the advertisements.

. For example, in March of this year the Attorneys General of seven States, including New York, filed a mammoth antitrust suit against numerous insurance companies alleging conspiracy to restrain competition and manipulate the cost of commercial general-liability insurance during the so-called "insurance crisis” (An Avalanche of Lawsuits Descends on Insurers, Business Week, Apr. 11, 1988, at 60). Rather than spiraling jury awards, as the insurance industry claims, the Attorneys General attribute the "crisis” to "boycotts, threats, intimidation, and other coercive conduct” by the defendants. (Op. cit., at 61.)

. A strong argument can be made the other way, and has indeed been expressed in concurring or dissenting opinions in some of the major Supreme Court cases. Looking to the First Amendment interest which involves maximizing speech and speakers, for example, Justice White has pointed out that the sheer market power of some speakers can, in this technologically dominated age, effectively monopolize debate to the end of actually decreasing available speech. Thus, he argues, since corporations are the creatures of the state whose special treatment has allowed them to amass "economic power which may * * * dominate not only the economy but also the very heart of our democracy, the electoral process” their speech should be subject to regulation to avoid their "threatening the role of the First Amendment as a guarantor of a free marketplace of ideas” (First Natl. Bank of Boston v Bellotti, 435 US 765, 809-810 [White, J., dissenting]). One model for regulation of corporate speech which might alleviate this problem involves corporate subsidization of alternate viewpoint (see, e.g., Richards, The Jurisprudential Sin of Treating Differents Alike: Emergence of Full First Amendment Protection for Corporate Speakers, 17 Mem St U L Rev 173, 177 [1987]) but the Supreme Court’s sharply divided decision in Pacific Gas & Elec. Co. v Public Utils. Commn. (475 US 1, reh denied 475 US 1133 [1986]) has dashed hopes for any immediate approval of such speech-enhancing regulation. The choices about commercial and corporate speech made by the current Supreme Court majority are, however, binding on this and other courts, and must be followed here.

. Indeed, these "debate-influencing” advertisements would seem to be precisely the sort the court anticipated as entitled to protection in Central Hudson Gas & Elec. v Public Serv. Commn. (447 US 557, 565, n 7).

. Other courts which have been confronted with similar insurance industry campaigns have upheld claims of First Amendment privilege (Quinn v Aetna Life & Cas. Co., 616 F2d 38 [2d Cir 1980] [Per Curiam], affg 482 F Supp 22 [ED NY 1979] [dismissing action to enjoin insurance company from running ads claiming that tort claims resulted in excessive jury awards]; but see, Quinn v Aetna Life & Cas. Co., 96 Misc 2d 545 [Sup Ct, Queens County 1978] [same parties in State court; court held First Amendment would not protect advertisement to the extent it might contain misleading advertising contravening plaintiffs’ rights to an impartial jury]; cf., Rutledge v Liability Ins. Indus., 487 F Supp 5 [WD La 1979]).